# UNITED STATES COURT OF APPEALS

## FOR THE ELEVENTH CIRCUIT

**ARI TEMAN,**

Petitioner–Appellant,

v.

**UNITED STATES OF AMERICA,**

Respondent–Appellee.

Case No. 25-12659-CC

ON APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No. 25-CV-22543-RAR

District Judge Rodolfo A. Ruiz II

## XII. APPENDIX (Table of Contents)

| Item | Page |
|------|------|
| A. Religious Leaders' Letters | 1 |
| A.1 24 Rabbis condemning Engelmayer's anti-semitic injustice and demanding recusal | 2 |

A.2 Israel Chief Rabbi David Lau affirming Petitioner's
obligation to remain in Israel                                    17

A.3 Chief Rabbi of Modiin – supporting Petitioner's
continued residence in Israel                                     18

A.4 Video of rabbis, community leaders, legal experts, and
family supporting pardon                                          20

B. National Commentary                                            21

B.1 Statement by Professor Alan Dershowitz condemning
proceedings                                                       22

B.2 Statement by Professor Lawrence Lessig condemning
proceedings                                                       23

B.3 Public statements by U.S. Pardon Attorney Edward
Martin Jr. declaring Petitioner innocent and calling for
pardon                                                            25

C. Expert Testimony                                               26

C.1 ENT specialist's diagnoses confirming Eustachian Tube
Dysfunction and no-fly orders                                     27

C.1a Doctor Letter regarding Eustachian Tube ET Function
test - source Hebrew and English                                  28

C.1b Doctor Letter regarding Eustachian Tube ET Function
test - English discussion                                         30

C.2 Engelmayer's order confirming the Government's own
expert did not contradict the no-fly recommendation of
Teman's specialists and Engelmayer ordering Teman to take
a boat to the USA                                                 32

D. Venue Evidence                                                 40

D.1 Transcript of statements by Akash Kazi, former
Signature Bank employee, confirming no essential conduct          41

occurred in SDNY. The financial transfers were completed
before any review (and review decisions were made in
EDNY, not SDNY)

D.2 Rule 60(b) motion in Stayed SDNY case arguing venue    60
must be SDFL anyway

D.3 Letter of Shelly Jenkins Pecot to Engelmayer    73
confirming two of the Government witnesses hid evidence
and were aware of the terms and fees Teman drafted

D.4 Docket 295 outlining how SDNY Prosecutors enabled    75
and encouraged their witnesses to hide exculpatory evidence

D.5 Affirmation of Ronald Coleman as to Engelmayer's    98
mentee, Biale lying to him and Teman about collecting
exculpatory evidence

E. Procedural Record    100

E.1 District court transfer order of June 18, 2025    101

E.2 District court denial of Rule 60(b) relief on July 31,    108
2025

# A. Religious Leaders' Letters

B"H

# Rabbi Leibel Khazanovich

Judge Paul Engelmayer
Southern District of New York
40 Foley Square
New York, NY 10007

12 Av, 5782
Aug 9, 2022

Dear Judge Engelmayer,

On behalf of the dozens of rabbis and legal experts who have signed the attached letter seeking your immediate resignation, we respectfully request the letter be filed to the docket in *United States v Ari Teman*. We have reviewed publicly filed information in the trial and appellate proceedings involving Mr. Teman, and our considered opinion is that your *ex parte* call providing one party in litigation a material tactical advantage (and your admission that this is a regular practice of yours), the non-disclosure of your interest in Bank of America until after trial and even then in an incomplete and deceptive manner, and your comments about Mr. Teman's faith constitute violations of *Halacha* and should be made public. In addition, we believe your conduct violates the Code of Judicial Conduct and the US Constitution, and should be publicly filed so that Mr. Teman and other parties before you can protect their rights.

Thank you,

*Rabbi Leibel Khazanovich*

Copying:     US Attorney Damian Williams
             AUSA Kedar Bhatia
             AUSA Jacob Guttwillig
             Mr. Ari Teman, Defendant
             Mr. Eden Quainton, Appellate Attorney for Mr. Teman
             *Via Electronic Mail*

[Page 2]

B"H
29th of Tamuz, 5782
Yom Kippur Katan Av
Thu, 28 July 2022

Judge Paul Engelmayer
District Judge
Southern District of New York
40 Foley Square
New York, New York

Damian Williams,
United States Attorney
Southern District of New York

**RE: Request for recusal or retirement of Judge Paul Engelmayer (USA v. Teman, 1:19-cr-00696)**

Your Honor,

We write to you as Rabbis and community leaders to express our deep concern over the treatment of Ari Teman, a young man who has been a pillar of the Jewish community and has suffered great hardship for a matter that should never have resulted in criminal prosecution and for which there is no evidence of any criminal intent. We are also deeply concerned with your handling of Mr. Teman's case and we are calling on you to recuse yourself from any further proceedings involving Mr. Teman, against whom you have formed a bias that, sadly, borders on anti-semitism.

### Mr. Teman's strong track record of supporting the Jewish community

Ari Teman's Jewish practice and *Ahavat Yisrael,* love for the Jewish people, requires a brief overview. Ari Teman has been an outstanding, exceptional leader and volunteer for the Jewish communities of New York, Miami, and across the United States, Israel, Canada, Australia, and beyond.

As the founder of JCorps International, he worked unpaid for years to build a multi-continent international volunteer organization that drove thousands of young adults to volunteer for the first time. There, besides feeding the hungry, visiting the elderly, comforting the sick, and beautifying their cities, young adults often met their spouses and created beautiful families, many formed friendships, and others changed careers and began a life of service.

Ari has consistently been one of the first to step up to help his local synagogues and Chabad Houses. He is active with Israel organizations such as United Hatzalah, FIDF, Aleh Negev, and more. He doesn't just donate, he volunteers to help create and lead programs and events.

### The legally baseless prosecution theory

Legal experts on all sides of the political spectrum -- from Harvard Law School Professor Lawrence Lessig to SCOTUS attorney Ronald Coleman - have concluded that the case against Mr. Teman is "legally baseless," "'ridiculous" and his conviction a "grave injustice." Although we know you are familiar with these letters, we are attaching relevant communications to the President of the United States and the US Attorney General that have impressed upon us the need to act in defense of an innocent man.

[Page 3]

The accusations against Mr. Teman do not withstand objective scrutiny. In a word, Ari stands accused of enforcing a contract all three clients who testified against him admitted they were aware of. All three clients admit GateGuard's invoices state that products and services are provided under a multi-year, non-cancellable contract, but the clients claim they simply chose to not read the Payment Terms subpage. The government's argument is that because these clients claim they didn't read a subpage, Ari should go to prison for enforcing it, an argument so far-fetched we are shocked the government could proceed, and even convict, on this basis.

Moreover, we are profoundly troubled by evidence that your Honor conducted an *ex parte* call with the Southern District of New York prosecutors to ensure there was "adequate supervision" of the government attorneys on the case—in effect signaling that you were taking sides in the dispute and that the government needed to bring in reinforcements to ensure Teman's conviction.

Your Honor's action has, in candor, shocked our consciences. The partiality on display in the ex parte call is also reflected in your insistence that it was the *defense's* burden to place the 2018 Payment Terms in evidence, even though it was the *Government*'s affirmative burden to establish that allegedly defrauded clients had not assented to the Payment Terms, which of course the Government should have been required to introduce into evidence as part of their own prima facie case. Without this crucial evidence, the Government's case should have been dismissed. Instead, you concluded that it was the Defendant's job to prove his innocence and not the Government's job to prove his guilt!

## Judge Engelmayer's Abuse of Judaism & False Testimony to Convict & Sentence Teman

However, what we find inexcusable, and what requires your recusal from the Teman case, is the anti-Jewish – even, alas, anti-semitic – tenor of your comments towards Mr. Teman. You claimed that drafting accounts on the Friday before Passover is a sign of intent to defraud, when the first two days of Passover that year fell on Saturday and Sunday, days which banks are officially closed. Such a claim constitutes an abuse of the Jewish faith for dishonest, misleading purposes. The Government and Court knew full well that Mr. Soleimani, for example, had WhatsApp messaged with Mr. Teman during the Intermediary Days ("Chol Hamoed") of Passover the year prior, and they knew full well that Judaism allows work, travel, and use of electronics on the Intermediary Days, and that Mr. Soleimani would be free to address any billing issues on Monday following the Passover weekend when banks were closed.

You then repeatedly distorted the record and even invented statements by Mr. Teman that he had intentionally chosen to use the Passover weekend to defraud his clients – statements for which there is not a shred of evidence in the record. It appears you were turned against Mr. Teman and then were so blinded with animus against him that you literally saw evidence that did not exist. Such conduct would be inexcusable in any judge, but is outrageous and intolerable in a Jew.

We are aware of a suicide note that the Government provided to you in which Mr. Teman makes irrational and delusional statements relating to Judaism. You knew perfectly well that Mr. Teman was suffering under grave physical and psychiatric distress when he wrote the suicide letter, due to a then-undiagnosed spinal condition, which was highly prejudicial and should only have been considered for the narrow purpose of determining whether Mr. Teman was fit to stand trial. Even a cursory review of the letter – completely at odds with Mr. Teman's character and his lifelong devotion to Judaism – should have been enough to convince you that Mr. Teman was not of sound mind and could not fairly be tried.

[Page 4]

Instead, you appear to have taken the letter at face value, and, without introducing it into evidence or informing the jury that you were in possession of highly damaging evidence that you chose to keep to yourself, used the letter to fuel your animus against Mr. Teman and paint him to the attorneys, the jury, his family and friends as a religious bigot — allegedly because of his drafting of checks on the Friday before Passover. When the Government argued to the jury that Mr. Teman's drafting of checks on this normal working day separated from Intermediary Days by a weekend when banks would be closed showed intent to defraud you sat by impassively, apparently endorsing this horrible accusation and then adopting it as your own.

As Rabbis, we cannot countenance your dishonest abuse of Jewish practices and your calumnious attacks on Mr. Teman. If anything, you should have seen Mr. Teman's letter as a cry for help from a very sick person who completely lacked capacity to stand trial, not as a basis for the animus you then displayed against him. We believe your conduct is so egregious that you should immediately recuse from any further proceedings in the case and extend an apology to Mr. Teman and the Jewish community. Americans of all faiths must have confidence that judges are not guided by improper sentiments and do not abuse the Jewish faith to convict anyone, under any circumstances.

### Judge Engelmayer's personal & financial bias

In addition to the many instances of prosecutorial misconduct described in Mr. Teman's filings and in his brief on appeal, which we have read with equal parts sadness and anger, we are particularly troubled by your delay in disclosing that you and your family are beneficial owners of over $2,000,000 in Bank of America shares, when Bank of America was the only alleged economic victim in the case. For you to sit as judge in a case with such a strong motive to find in favor of Bank of America is unbefitting any Judge. Even if you believed you could rule impartially in this case, the confidence of the public, Jewish and Gentile, in the rule of law is profoundly shaken by the sight of a judge with a substantial financial interest in a case sending a defendant to prison over an amount that pales in comparison with the judge's financial interest. For a Jew, who should stand as a light to the nations, to engage in such subterfuge and self-interested obfuscation undermines and discredits our faith.

### A note on Jewish laws violated by Judge Engelmayer

As Jews we have an obligation to correct moral and Halachic failings of a fellow Jew, in this case, your Honor. We can only condemn your Honor's multiple, significant violations of Jewish law. These include:

1. Requiring a Jewish, defendant to appear on Jewish Holidays (Shemini Atzeret) and stay in court into the Sabbath. Also, requiring a Jewish observant witness (Reinitz) and defendant to remain in court into the Sabbath despite protest from the defendant (Dkt _).[1] In fact, requiring even the non-Jewish attorneys to participate was and is a violation of Jewish law.[2]

   The foregoing judgments are not esoteric Halacha (Jewish Law), but rather stem from the plain text of one of the Ten Commandments: "But the seventh day is a sabbath unto the LORD thy God, in it thou shalt not do any manner of work, thou, nor thy son, nor thy daughter, nor thy man-servant, nor thy maid-servant, nor thy cattle, nor thy stranger that is within thy gates;"[3]

   Moreover, by causing Teman to disrespect the Sabath, you are guilty of prohibition of *Lifnei iver,*

---

[1] Shemot (Exodus) 20:9; *Mechilta,* Shemot (Exodus) 12:16
[2] Beit Yosef end of D.C. 344, Shulchan Aruch HaRav, Orach Chaim 343:1; Maimonides, Laws of Shabbat 6.
[3] Shemot (Exodus), 20:9

[Page 5]

causing another Jew to sin.[4]

2. Making false testimony by fabricating "statements Teman did not make and do not appear at all in evidence (not even the Government or its witnesses suggested Teman said he would draft accounts on Passover) and then basing sentencing on it. (Exodus 20:12, "You shall not bear false witness against your neighbor.") , While also turning a blind eye to exculpatory evidence (Dkt. 284, 294, etc.) and delaying hearings on exculpatory evidence.[5]

3. Judging a case in which you have a significant ($2M+!) financial interest in the only alleged economic victim in the case,[6] and in which you are close personal friends with attorneys on both sides (Mr. Noam Biale and his wife AUSA Margaret Graham) who willfully violated disclosure obligations and violated Mr. Teman's right to conflict-free counsel and attorney-client confidentiality. Your Honor's conduct in this respect constitutes and egregious violation of Jewish law[7].

4. Making ex parte call(s) to ensure "extra supervision" to only one side .

Violating the Sabbath, bearing false witness, hiding material evidence, displaying favoritism toward an accuser — such behavior is unacceptable and unbefitting of a Jew.

Under Jewish law, your Honor has a duty to apologize and make Mr. Teman whole. Jewish Law is clear that only Mr. Teman, not G-d nor any Rabbis, can forgive the grave abuses you have committed. We call on you to atone for your conduct without delay.

**Summary**

For the above reasons, and in light of the severity of the conduct described, your Honor should not only recuse yourself from any further involvement in the Teman matter, but your Honor should retire from the bench immediately.

---

[4] Rav Ovadiah Yosef, *Teshuvot Yechaveh Da'at 4:65*; Also, Chazon Ish (*Sanhedrin* 15:4))

[5] Rambam, Hilchot Sanhedrin 24,2; Rav Ovadia Yosef, Responsa Yabia Omer 1,41.

[6] Talmud Bavli, Bava Basra 43a (("If one says, 'Give a sum of money to the people of my city,' the case may not be judged by judges of that city, nor may evidence be presented based on the testimony of residents of that city."); Shulchan Aruch, Choshen Mishpat 37:1 (ruling that where two partners own a single property and a suit is brought against one of the partners alleging that the whole property had been stolen from the plaintiff and illegally sold to the partner-defendant, the non-party partner is disqualified from judging the case) and Shulchan Aruch, Choshen Mishpat 37:4 (ruling that a debtor holding a debt in partnership with another party is disqualified from judging a case brought by the creditor against only the partner for repayment of the loan) with Shulchan Aruch, Choshen Mishpat 37:11 (holding that where A holds a note of credit against B and conveys the note to C, B is disqualified from judging an action seeking to invalidate the conveyance since he may prefer to be indebted to A over C, or vice versa) and SHULCHAN ARUCH, Choshen Mishpat 37:15 (ruling that where A sells property to B without a guarantee and C subsequently brings a suit against B to recover title to the property, A is disqualified from judging the case since he may prefer that the property remain with B so that his own creditors can attach the property to pay debts owed to them by A). (From https://ir.lawnet.fordham.edu/cgi/viewcontent.cgi?article=2418&context=ulj )

[7] R. ASHER B. YECHIEL, RESPONSA ROSH 6:25 (disqualifying a judge from deciding a case involving a bequest of books and lamps to the synagogue the judge frequented, even though the members of the congregation would be under no obligation to purchase these items themselves if the bequest was invalidated);) (Ibid)

[Page 6]

We also respectfully ask that the United States Attorney for the Southern District of New York, Mr. Damian Williams, seek the immediate dismissal of this case. Mr. Williams inherited this case but he has had ample time and notice to stop the injustice and has failed to do so.

America has a Constitution. Jews have the Torah and oral and written commentary developed over millennia. No judge should disrespect the former, no Jew should disrespect the latter. Alas, your Honor has run afoul of both. We respectfully ask that your Honor examine his conscience and take the only appropriate steps under the circumstances: immediate recusal and withdrawal from the bench.

Any action short of these steps sends an unmistakable message that the Constitution and our sacred laws and traditions can be ignored and violated to serve the needs of the rich and well-connected.  The damage to the Jewish community from your Honor's continued involvement in the Teman case would be incalculable. We are confident that, in your heart, you know the right course of action. We call on you to follow the conscience G-d has given you and step down so that Mr. Teman can be free again to devote himself to the Jewish community for which he has such love and of which he is so proud. .

Signed,

Rabbi Reuben Koolyk, Esq., MD
Yeshiva University

Rabbi Menachem Mayberg, Esq.
LEC

Rabbi Andrew Schein
Yeshiva University

Rabbi Sidney Slivko
Bay Terrace Garden Jewish
Center Queens (ret),
Yeshiva University

Rabbi Jeffrey Shron
Yeshiva Pirchei Shoshanim,
Kehilath Israel, Kansas City (ret)

Rabbi Zvi Karpel
Chaplain (ret) Daughters of Israel,
West Orange, NJ.

Rabbi Chezky Wolff
The Chelsea Shul

Rabbi Shmuel Druin LCSW
Chaplain, North Miami Police
Dept.

Rabbi Eitan Webb
Princeton University

Rabbi Yonah Blum
Columbia University

Rabbi Chayim B. Alevsky
Chabad Family Programs, NYC

Rabbi Leibel Khazanovich
YJP  South Beach,
Hebrew Academy (RASG)

Rabbi Ephraim Simon
Friends of Lubavitch of Bergen
County

Rabbi Levi Teldon
Alamo Chabad

Rabbi Mendy Krinsky
Chabad Jewish Center Needham

Rabbi Moshe Z. Schapiro
Chabad of Hoboken

Rabbi Aryeh Weil
Congregation Bnai Yeshurun,
Teaneck (ret)

Rabbi Shraga Mann
Chabad of South Beach

Rabbi Zev Katz
Miami Beach Chabad

Rabbi Yakov Bankhalter
Chabad Loft

Rabbi Moishe Korf
Chabad of Miami Gardens

Rabbi Eliezer Tewel
Chabad Israeli Center

Rabbi Moshe Klar
JETS, Beis Menachem

Rabbi Yossi Smierc
KSPACE



# HARVARD LAW SCHOOL

LAWRENCE LESSIG
ROY L. FURMAN PROFESSOR OF LAW AND LEADERSHIP
1563 MASSACHUSETTS AVE
CAMBRIDGE · MASSACHUSETTS · 02138
TEL. (617) 496-8853
LESSIG@LAW.HARVARD.EDU

November 12, 2020

President Donald J. Trump
1600 Pennsylvania Avenue
Washington, DC 20500

The Honorable William Barr Attorney General

The Honorable Jeffrey Rosen
Deputy Attorney General
United States Department of Justice
950 Pennsylvania Avenue N.W.
Washington, DC, 20530

Re: Ari Teman

I have reviewed, *pro bono,* the case involving Ari Teman. Ari was convicted for acts that certainly do not establish a crime nor evince any criminal intent. I urge the Justice Department to dismiss the case or the President to pardon Mr. Teman.

The facts underlying this case involve a business dispute between Mr. Teman's company, GateGuard, and some of its clients. Those clients had failed to pay for the services GateGuard had provided. Pursuant to the terms agreed to by the clients and GateGuard, Mr. Teman effected a transfer of funds from the clients' bank accounts to GateGuard. The clients had contractually authorized GateGuard to collect overdue fees in this way. The contract that authorized this was not crafted by Mr. Teman, but by his lawyers. They had patterned the agreement on other well known companies (such as AirBnB). The lawyers' work obviously cannot be the foundation for a finding of Mr. Teman's fraudulent intent.

Whether GateGuard's contract should be enforceable in a civil court is an interesting question for academics to consider. GateGuard's customers acknowledged they received the contracts; they claimed they hadn't read it. Again, that poses an interesting question for a contracts exam. It doesn't evince fraudulent intent by

1

[Page 8]

Mr. Teman. Indeed, the reality of online commerce is that agreements like this are the norm. The judge in this case suggested that the terms authorizing the transfer of funds were buried in the contract. GateGuard's contract is actually quite concise relative to many online agreements. The suggestion that a surprising term in an online agreement constitutes an intent to defraud would render most banks and credit card companies guilty of fraud. Nothing in GateGuard's terms of service is extreme or unusual.

The judge in this case, writing to uphold a jury verdict, was constrained to justify the jury's verdict. He was therefore persuaded that the fees charged were unreasonable. And he was skeptical that the terms authorizing a transfer were in fact present at the time the clients agreed to the contract.

But the fees were charged as many contracts — cell phones contracts for example — provide today: a low monthly fee that is accelerated if a contract is terminated early, or not kept current. And the evidence in this case demonstrates conclusively that the term authorizing transfers from the clients' accounts was both part of the original agreements and expressly acknowledged by at least some of the clients.

What explains this prosecution is not the law, nor the justice within this commercial dispute. What explains it, apparently, is the relative inexperience of the front line prosecutors. Those prosecutors were new to the U.S. Attorney's office. They allowed their inexperience to guide their intuitions. And once it was clear that they had uncovered not a criminal commercial enterprise but ordinary online commerce, rather than acknowledging their error, and the injustice in prosecuting a commercial dispute as a crime, they continued to press the prosecution against Mr. Teman.

This behavior is surprising and troubling to those like me who have high regard for United States Attorneys. Yet it is clear that sometimes, winning becomes more important than justice. The prosecution of Mr. Teman is not justice. It is not a credit to the work of the Department. I urge you to take whatever steps are possible to stop this prosecution before Mr. Teman is sentenced to prison.

Sincerely,



Lawrence Lessig

2

Shelly Jenkins Pecot
18 Mercer St. New York NY 10013
shelly.pecot@gmail.com (917) 561-6505

Judge Paul Engelmayer
District Judge
Southern District of New York
40 Foley Square
New York, NY 10008

August 21, 2021

Your Honor,

My name is Shelly Jenkins Pecot. I am a shareholder at 18 Mercer. I was out of the country when I was subpoenaed to testify.

With regard to 18 Mercer, I do not believe Ari Teman should go to prison.

Ari Teman did warn myself and other shareholders of what he said were the following terms in the contract he signed with our then board Vice President via an online document.

1. There was an $18,000 fee for removing the device
2. There was a $10,000 fee for collections
3. There would be attorney fees
4. There was binding arbitration
5. That he believed he had the right to draft owed monies from our bank account

I confirm that I did text with Mr. Teman and that the texts he has shown to me are accurate and match those on my phone.

I also confirm that I did forward the two attached emails to Mr. Teman on Aug 19th.

I do not live in New York and was only at the coop for a few days while Mr. Teman's device was installed. During that time, the device was connecting to the app but seemed to be disconnected from the door lock.

My personal interactions with Mr. Teman on this matter were amicable at first. I believed that he wanted to work with us to get his device working properly. Mr. Teman told me that our internet was not sufficient to run the device and that he had informed the board of this. Mr. Teman also told me that he had added a new router to help with this issue.

I was informed by another shareholder that this shareholder had been told by contractors that Bonnie Soon-Osberger had instructed them to disconnect the device. At the time, my suspicion was that it had been sabotaged to justify going with a different company. However, I had no direct proof of this and now believe they were referring to when the device was removed to be replaced.

I have no direct knowledge of Mr. Teman's interactions with the board or management. However the management team did insist to shareholders that they had no interactions with Mr. Teman. Mr. Teman forwarded me emails between himself and management to show me that they were not being truthful.

[Page 10]

I am out of state, but I would be happy to speak by Zoom on this matter if you have any further
questions.

Shelly Jenkins Pecot

Aug 20, 2021

Shelly Precot appeared before me
on August 20th 2021

Melody Hannigan as notary

MELODY HANNIGAN
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID# 20064012643
MY COMMISSION EXPIRES APR. 05, 2022



RCOLEMAN@DHILLONLAW.COM
ADMITTED IN NEW JERSEY AND NEW YORK

November 30, 2020


**BY EMAIL**

The President
The White House
1600 Pennsylvania Avenue
Washington, DC  20500

The Honorable William Barr
Attorney General
United States Department of Justice
950 Pennsylvania Avenue N.W.
Washington, DC  20530

<div align="center">

Re:     **Pardon application of Ari Teman**
        **U.S. v. Teman (S.D.N.Y. 1:19-cr-00696)**

</div>

Mr. President and Attorney General Barr:

I am a lawyer who has been active in the practice of Internet-related law, including issues concerning the formation of contracts and, in particular, the law relating to unfair and deceptive trade practices relating to the Internet for decades.  I have lectured and written extensively on these subjects,  and I write today to join with the esteemed legal authorities and figures, including Prof. Alan Dershowitz, Prof. Lawrence Lessig and outstanding attorneys such as Molly McCann (General Flynn's attorney), David Markus, Pat Nolan, Kurt Schlichter, Robert Barnes, David Safavian, and others – all of whom, like me, have made themselves available *pro bono publico* concerning this cause – in urging a full pardon for Mr. Ari Teman, the defendant in the referenced criminal matter.  Although I am using my professional letterhead in this instance because I am writing as a lawyer, Mr. Teman is not a

<div align="center">

**DHILLON LAW GROUP INC.**
A CALIFORNIA PROFESSIONAL CORPORATION
**8 HILLSIDE AVENUE, SUITE 103  |  MONTCLAIR, NJ 07042| 973-298-1723**

</div>

client of our firm and has never been one. Moreover, I speak only for myself, albeit professionally, in this letter. I explain my reasoning below.

The President and Attorney General will doubtless be aware of correspondence received concerning Mr. Teman's case that addresses extensive claims of prosecutorial misconduct. I am neither familiar enough with the record nor qualified by experience or otherwise to offer an opinion concerning these matters; nor would I presume to address them in a pardon application given the procedural posture of the defendant at this time. I do, however, have the experience to address the very narrow issue of whether the criminal offense with which Mr. Teman was charged and convicted should properly be considered criminal, or even deceptive, at all.

Mr. Teman was essentially convicted on the basis of what is commonly called a "click-wrap" contract, meaning the web-based terms that an Internet business – in this case, Mr. Teman's company, GateGuard – uploads and requires users to agree to before offering a product or service. It is well established that such online contracts are, under virtually all circumstances, proper and enforceable, and that their terms govern the seller's relationship with its customers. The Government's theory of criminal liability was that the structure of GateGuard's online terms was evidence of an "intent to defraud" its customers, however. Ultimately, the District Court ruled that the jury could have reasonably convicted Teman of fraud because GateGuard's terms included hyperlinks to subpages, requiring them to follow those links in order to be fully apprised of the terms to which they were agreeing to be subject in their relationships with GateGuard. The premise of this ruling appears to be that the use of hyperlinks, as opposed to cutting and pasting text and information into the terms found online on one webpage, constituted a sort of deception.

With all due respect to the District Court judge, I write to urge that such an interpretation of the custom and practice utilized throughout the world of Internet commerce is incomprehensible. Certainly, there is no question that virtually all contemporary businesses utilize online contracts to offer their services to the public and subsequently to document the terms under which their customer relationships will continue to proceed. And it is beyond question that the practice of using hyperlinks to extend, elucidate or otherwise incorporate online contractual terms in e-commerce websites, using subpages and hyperlinks, is widespread and uncontroversial. Organizing terms and related information in this way benefits businesses and customers alike, allowing all parties access and reference to them, and the ability to update specific sections of the terms, when necessary and appropriate. There is no obvious or even rationale for claiming that it is deceptive or fraudulent for Internet-based customers, who are at this point in technology history intimately familiar with how the Internet works, to click a clearly-highlighted hyperlink to obtain information. Indeed, it can be argued that doing so is far more convenient, and makes the information more accessible, than repetitive scrolls down a massive screen jammed with

November 30, 2020
Page 3 of 5

verbiage. That is why the practice of using hyperlinks and subpages for contract terms is employed by companies such as Amazon, Google and Netflix.

Notably, GateGuard's terms are effectively identical in form and substance to those used by another national company Airbnb, a recognized leader in the same industry (property management) in which GateGuard operates. This should come as no surprise, because it is common practice among web designers and legal counsel advising new online businesses to recommend that new businesses "borrow" such terms where available online content in setting up their own e-commerce sites. The advantage of doing so are obvious: Similar businesses that are already successful in the same market have typically customized their terms of service to that market based on commercial experience, and are presumptively acceptable to regulators given the high profile and success of such market leaders. Despite the fact that the Government repeatedly emphasized the format and structure of GateGuard's terms as evidence of Teman's guilt during trial, I am aware of no claim by either criminal or regulatory authorities that the virtually identical terms and structure used by Airbnb are problematic, much less felonious. In fact,

The case law is clear that online contract terms that incorporate content via sub-pages and hyperlinks are legal and binding. I am also advised that testimony at trial by customers of GateGuard established that these consumers themselves were aware of this fact and that all the information needed to understand the applicable terms of service were no more than a click or two away at any time of the day or night. It is not necessary for consumers to actually click such supplementary links in order for them to enforceable parts of the contract between them and the online merchant. Thus, for example, in *Meyer v Kalanick (Uber)*, the Second Circuit ruled that plain text disclosure of terms being applicable were binding whether or not the user clicked the link – just as a consumer, given the opportunity to read a long paper contract, has the discretion to go through each word on each page or not. Indeed, as Professor Lessig, the preeminent internet law expert, has attested in his letter to you, GateGuard's online terms are relatively concise compared to many common and unquestionably enforceable online terms.

The argument that consumers, much less business entities, are defrauded when they choose not to click a hyperlink to read a contract subpage turns generations of contract law as well as basic principles concerning fraud in the inducement of a contract on their heads. Even in the consumer context, fraud requires that the non-disclosing party not have a reasonable opportunity to obtain information by virtue of non-disclosure by the party against whom fraud is claimed – a situation that simply does not apply when full disclosure is available by clicking on a hyperlink. This obligation on the buyer to do a minimum of diligence on its own behalf applies even more powerfully in a commercial context such as the one in question here. Such "B to B" (business to business) online users can and should reasonably be expected by the law to not only review a prospective contract in depth but to have their legal representatives do so before entering into a contract of substantial value. For this

November 30, 2020
Page 4 of 5

reason, in *GateGuard, Inc. v. MVI Systems LLC*, (1:19-cv-02472) (S.D.N.Y. 2019), the Southern District upheld the GateGuard arbitration clause – found on the Dispute Terms subpage of GateGuard's Terms.

It is difficult indeed to understand how both this straightforward legal standard and testimony that GateGuard's customers not only should have, but did know the terms of their contracts with GateGuard before they agreed to them, could have been disregarded by the court and the jury at Mr. Teman's trial. I have learned that two of the three entities involved were, according to unrebutted testimony, shown not only to have read the first page of the terms in depth, but that they copy-pasted the paragraph referencing the Payment Terms into emails to Mr. Teman in order to ask him questions about those terms **before** they agreed to them! The third entity not only discussed the exclusivity and non-compete segments, moreover, but even emailed GateGuard's attorney asking for "a release" from certain terms. Under these circumstances, Mr. Teman was quite justified in understanding that the GateGuard terms were legal, binding and enforceable, and that taking action to enforce those terms could not amount to a criminal *mens rea* on the part of Mr. Teman. (As Professor Lessig points out, the high fees make sense, because these clients owed the majority of multi-year agreements and also incurred collections penalties, as are standard with equipment and service financing agreements.)

That Mr. Teman lacked criminal *mens rea* appears irrefutable, moreover, because as would be expected, Mr. Teman did not structure his company's terms, his company's law firm did – and, again, those terms were based on Airbnb's, which also faces the issue of illegal sublets, which is potentially devastating to its business. I am also informed, however, that this "structuring" theory of criminal liability was essentially sprung on the defense by the government at closing argument and post-trial motions, thus depriving Mr. Teman of the opportunity to rebut it by testimony and documentation proving that his attorneys who emailed him the terms, discussed how they were structured online in the same way as Airbnb's, and establish for the jury that in publishing those terms in that format Mr. Teman was relying on counsel – which, under *United States v. Scully*, would at least have required a jury instruction regarding the government's burden of proof concerning intent, a necessary component for a conviction on charges of wire fraud and bank fraud. 877 F.3d 464 (2d Cir. 2017). For the district court to have, instead, permitted the government's to rely on its "structuring" claim as a basis for the jury to find criminal intent was a miscarriage of justice.

I did not know Mr. Teman until he approached me, because of my background in this area of law, concerning his conviction. I agreed to assist him without charge or consideration in part because, from the point of view of e-commerce clients I represent, the conviction of Mr. Teman for fraud on the basis of his company's online terms creates a real danger for online businesses and their executives that is not justified by statute and which threatens all e-commerce enterprises. While contractual disputes between customers and online sellers are inevitable, they are properly addressed in **civil** proceedings except for the most egregious and

**DHILLON LAW GROUP INC.**

A CALIFORNIA PROFESSIONAL CORPORATION

8 HILLSIDE AVENUE, SUITE 103  |  MONTCLAIR, NJ 07042|  973-298-1723

November 30, 2020
Page 5 of 5

impactful criminal conduct. That is not what happened here, and the criminal conviction of Ari Teman for the use and reliance on widely-used contract terms and business practices is deeply troubling and a threat both to online commerce but fundamental notions of justice and personal liberty.

    I am very grateful for your consideration concerning these remarks and, again, respectfully urge that Mr. Teman receive a pardon and that the Department of Justice issue appropriate guidance to prosecutors regarding criminal prosecutions of this nature.

              Most respectfully,

              Ronald D. Coleman

דוד לאו
הרב הראשי
נשיא בית הדין הרבני הגדול (בדימוס)

David Lau
Chief Rabbi
President Of the Great Rabbinical Court (retired)

**מכתב המלצה עבור ארי טימן**

**לכבוד שופט בית המשפט הנכבד**

השלום והברכה!

הובא לפני המקרה של ארי טימן אשר כפי ששמעתי שילם בכסף ובמאסר על שגיאותיו בעבר, ומעבר לעונש באמצעות החוק, לקה גם בבריאותו, ועכשיו הגיע לארץ הקודש לביקור אצל הוריו.

לאחר שהתעניינתי על מעשיו בארץ ובקהילה שבה הוא נמצא עכשיו, התרשמתי כי הוא מנסה לפתוח דף חדש ועוסק רבות בעזרה לחברה ובהתנדבויות שונות. נראה שהוא הפיק את הלקחים מהעבר ונמצא בדרך חדשה ובלווי צמוד של הוריו המשתדלים גם לסייע לו בשיקום גופו בכדי שיוכל להקים משפחה וחיים חדשים.

ברצוני לבקש ממך מאוד כי לאחר שהופעלה מידת הדין בעניינו של ארי, יש לתת הזדמנות גם למידת הרחמים לפעול את פעולתה, ולהוכיח לאדם עצמו ולחברה, כי גם מי שחטא יכול להשתקם ולפתוח בדרך חדשה. מה גם כשמדובר בארץ חדשה שמצאנו במקורות ששינוי המקום מסוגל להשפיע ולשנות לטובה את התנהגותו של האדם ומאפשרת לסלוח לו כמובא בגמ' בראש השנה דף טז עמוד ב, ובפרט בארץ הקודש שיש בה הרבה אתגרים טובים שניתן להשקיע ולהתפתח בהם לטובה.

בימים אלה שלפני חג הפסח שבו יצאו ישראל לחירות ממצרים בדרכם לארץ ישראל, ברצוני להמליץ מאוד בפני כבוד בית המשפט להיענות לבקשתו להישארותו בארץ של ארי טימן בכדי לתת לו את ההזדמנות להוכיח לנו שהשינוי לטובה שהחל בו ימשיך לעתיד טוב יותר שלו ושל כולנו.

בברכה
דוד לאו

דוד לאו DAVID LAU CHIEF RABBI הרב הראשי

למען אחי ורעי
מרכז לאו
בנשיאות הרב הראשי - הרה"ג דוד לאו שליט"א

O@lau.co.il +972-58-5005531 | +972-2-5005531

נסרק עם CamScanner

בס"ד



לשכת הרבנות
מודיעין מכבים רעות

# לשכת הרבנות-מודיעין מכבים רעות
# THE CHIEF RABBINATE
# OF MODI'IN

February 2, 2025

Your Honor,
The Honorable Judge Paul Engelmayer,
New York Court

Subject: Ari Teman

I am acquainted with the Teman family here in the Holy Land, Israel—the parents of Ari Teman:
the father, David, and the mother, Suzan—a principled family that is very dear and important to us.
Ari Teman has fulfilled the Court's ruling, both in terms of payment and imprisonment, and now he
is starting a new chapter, currently in the probation process.

I hereby request His Honor the Judge to allow Ari Teman to immigrate to the Holy Land, Israel, and
to live near his parents of our city of Modi'in Maccabim Reut, where his parents can better assist
him in the process of healing and rehabilitation as required. When he is here, we will be able to pay
closer attention to Ari and provide him with more care, love, and warmth than he would receive
while alone.

Especially since his treatment is conducted via Zoom, it is possible for him to fulfill the
commandment of immigrating to Israel—a precious and important mitzvah in our faith and
religion—which every Jew is obligated to uphold. He can continue his Zoom sessions here by our
city.

I would like to note to His Honor the Judge that the probation department approves and permits
him to fulfill this mitzvah of immigrating to the Holy Land, both because of the religious
commandment that will grant him greater spiritual and emotional wholeness, and because reuniting
with his family will benefit and support him more.

And I hereby bless His Honor the Judge: May God fulfill the desires of your heart for good and for
blessing.

With Torah blessings,
Rabbi Yaakov Chikotai
Chief Rabbi of Modi'in Maccabim Reut

בס"ד

# לשכת הרבנות-מודיעין מכבים רעות
# THE CHIEF RABBINATE OF MODI'IN

לשכת הרבנות
מודיעין מכבים רעות

כ"ה בשבט תשפ"ה

23-02-2025

לכבוד

מכובדנו

כבוד השופט פול אנגלמייאר

בית משפט

ניו יורק.

הנדון: <u>ארי טימן</u>.

הריני מכיר את משפחת טימן, כאן בארץ הקודש ארץ ישראל, הוריו של ארי טימן, האבא – דוד , האם – סוזן, משפחה ערכית חשובה ויקרה לנו מאוד.

ארי טימן קיים את פסק הדין של בית המשפט הן בתשלום והן המאסר, וכעת הוא מתחיל דף חדש, ונמצא כעת בשלבי מבחן.

הריני מבקש מכבוד השופט לאפשר לארי טימן לעלות לארץ הקודש, ארץ ישראל, ולגור עם הוריו בעירנו מודיעין מכבים רעות, וכאשר הוריו יכולים לעזור לו יותר בתהליך ההבראה והשיקום כנדרש. וכאשר הוא כאן נוכל לשים לב יותר לארי, ולהקדיש לו יותר תשומת לב ואהבה וחיבוק, מאשר כשהוא בודד.

ובפרט כאשר הטיפול נעשה בזום, אפשר שהוא יקיים את המצות העלייה לישראל שהיא מצוה יקרה וחשובה באמונתנו ודתנו. כאשר כל יהודי מחוייב במצווה יקרה וחשובה זו. ויכול לעשות בזום כאן בעירנו.

אציין בפני כבוד השופט שמחלקת המבחן מאשרת ומאפשרת לו את קיום המצווה את העלייה לארץ הקודש. הן מפני המצווה הדתית שתתן לו שלמות נפשית ורוחנית יותר, והן מפני איחוד המשפחה אשר יעזור ויועיל לו יותר.

והריני מברך את כבוד השופט, שהשם ימלא משאלות לבך לטובה ולברכה.

בברכת התורה

הרב יעקב צ'יקוטאי

הרב הראשי

לעיר מודיעין מכבים רעות.

לשכת הרבנות מודיעין - רח' דם המכבים 1, אתר הקראוונים ת.ד. 1 מודיעין 71700 טל. 08-9726170 פקס. 08-9707267
THE CHIEF RABBINATE OF MODI'IN. 1 DAM HAMACABIM ST. P.O.B 1 MODI'IN 71700 ISRAEL TEL: 972-8-9726170 FAX: 972-8-9707267
E-mail: esti_o@modiin.muni.il

Video of Rabbis, Community Leaders, Legal experts, and family supporting pardon:

https://youtu.be/59YZ0YFemps?si=sq_QJBE_Cv1xNXdC

A DVD copy can be provided as well with the court's instructions.

# B. National Commentary

October 15, 2020

President Donald J. Trump
1600 Pennsylvania Avenue
Washington, DC 20500

The Honorable William Barr
Attorney General

The Honorable Jeffrey Rosen
Deputy Attorney General
United States Department of Justice
950 Pennsylvania Avenue N.W.
Washington, DC, 20530

RE:  Ari Teman

I am writing this cover letter on behalf of Ari Teman, whose case I have reviewed.

I believe that his conviction constitutes a miscarriage of justice for two reasons: first and foremost, evidence I have reviewed does not prove a crime or criminal intent. It is, at bottom, a business dispute that should have been resolved in civil court; second his lawyers have alleged prosecutorial misconduct that raised serious concerns about the integrity of the process by which he was convicted.

I have come to know Ari over the past months and he impresses me as a good person who had no intention to defraud anyone or commit any crime.

I believe justice would be served if the case were dismissed or the sentence commuted.

Sincerely,


Alan M. Dershowitz



# HARVARD LAW SCHOOL

LAWRENCE LESSIG
ROY L. FURMAN PROFESSOR OF LAW AND LEADERSHIP
1563 MASSACHUSETTS AVE
CAMBRIDGE · MASSACHUSETTS · 02138
TEL. (617) 496-8853
LESSIG@LAW.HARVARD.EDU

November 12, 2020

President Donald J. Trump
1600 Pennsylvania Avenue
Washington, DC 20500

The Honorable William Barr Attorney General

The Honorable Jeffrey Rosen
Deputy Attorney General
United States Department of Justice
950 Pennsylvania Avenue N.W.
Washington, DC, 20530

Re: Ari Teman

I have reviewed, *pro bono*, the case involving Ari Teman. Ari was convicted for acts that certainly do not establish a crime nor evince any criminal intent. I urge the Justice Department to dismiss the case or the President to pardon Mr. Teman.

The facts underlying this case involve a business dispute between Mr. Teman's company, GateGuard, and some of its clients. Those clients had failed to pay for the services GateGuard had provided. Pursuant to the terms agreed to by the clients and GateGuard, Mr. Teman effected a transfer of funds from the clients' bank accounts to GateGuard. The clients had contractually authorized GateGuard to collect overdue fees in this way. The contract that authorized this was not crafted by Mr. Teman, but by his lawyers. They had patterned the agreement on other well known companies (such as AirBnB). The lawyers' work obviously cannot be the foundation for a finding of Mr. Teman's fraudulent intent.

Whether GateGuard's contract should be enforceable in a civil court is an interesting question for academics to consider. GateGuard's customers acknowledged they received the contracts; they claimed they hadn't read it. Again, that poses an interesting question for a contracts exam. It doesn't evince fraudulent intent by

1

Mr. Teman. Indeed, the reality of online commerce is that agreements like this are the norm. The judge in this case suggested that the terms authorizing the transfer of funds were buried in the contract. GateGuard's contract is actually quite concise relative to many online agreements. The suggestion that a surprising term in an online agreement constitutes an intent to defraud would render most banks and credit card companies guilty of fraud. Nothing in GateGuard's terms of service is extreme or unusual.

The judge in this case, writing to uphold a jury verdict, was constrained to justify the jury's verdict. He was therefore persuaded that the fees charged were unreasonable. And he was skeptical that the terms authorizing a transfer were in fact present at the time the clients agreed to the contract.

But the fees were charged as many contracts — cell phones contracts for example — provide today: a low monthly fee that is accelerated if a contract is terminated early, or not kept current. And the evidence in this case demonstrates conclusively that the term authorizing transfers from the clients' accounts was both part of the original agreements and expressly acknowledged by at least some of the clients.

What explains this prosecution is not the law, nor the justice within this commercial dispute. What explains it, apparently, is the relative inexperience of the front line prosecutors. Those prosecutors were new to the U.S. Attorney's office. They allowed their inexperience to guide their intuitions. And once it was clear that they had uncovered not a criminal commercial enterprise but ordinary online commerce, rather than acknowledging their error, and the injustice in prosecuting a commercial dispute as a crime, they continued to press the prosecution against Mr. Teman.

This behavior is surprising and troubling to those like me who have high regard for United States Attorneys. Yet it is clear that sometimes, winning becomes more important than justice. The prosecution of Mr. Teman is not justice. It is not a credit to the work of the Department. I urge you to take whatever steps are possible to stop this prosecution before Mr. Teman is sentenced to prison.

Sincerely,



Lawrence Lessig

2

https://x.com/EagleEdMartin/status/1351554394383396865

← **Post**      **Reply**  ⚙ ⚖

 **Eagle Ed Martin** ✅  ⊘ •••
@EagleEdMartin

I agree!

 **Ari Teman** ✅ @AriTeman · Jan 16, 2021
Harvard Professor @Lessig went on @OANN to ask
@POTUS to pardon me:

youtube.com/watch?v=ZsyScH...

...



5:37 PM · Jan 19, 2021

💬 4        🔁 687        ♡ 3.9K        🔖 5        ⬆

# C. Expert Testimony

**APPEAL RESPONSE - EXHIBIT 2 - ETF TEST**



The Chaim Sheba Medical Center
Hearing, Speech, and Language Center
Tel:  03-5305842
Fax:  03-5302515

שיבא
תל-השומר

המרכז הרפואי ע"ש חיים שיבא
מכון שמיעה, שפה ודיבור
03-5305842
03-5302515

בדיקת טימפנומטריה/רפלקס אקוסטי

שם הנבדק:  ארי  תימן
תאריך לידה:  10/05/1982
שם הבודק:  ליאור רז
גורם מפנה:

ת.ז.  8801178200
גיל בזמן הבדיקה:42  שנים
תאריך הבדיקה:  03/04/2025

טימפנומטר
רישיון:  13-142677

בדיקת טימפנומטריה

| אפיוני התגובה | אוזן ימין | אוזן שמאל |
|---|---|---|
| Probe | 226Hz | 226Hz |
| TYPE + PEAK (daPa) | A-3 | A-7 |
| הענות ביחס לנורמה (cm³) | 1.15 | 0.78 |
| Ear Canal Volume (cm³) | 1.6 | 1.0 |
| סיכום: | עקומת Type A תקינה עם שערכי הענות בנורמה | עם שערכי Type A הענות בנורמה |

הערות:  הגיע לבדיקת ETF בהפנית ד"ר וולפוביץ' בשל תלונות על כאבים וחרושת של לחץ באוזן ימין שהחלה לפני כחודשיים אחרי טיפול בתא לחץ. ביצע אתמול בדיקת שמיעה: בשתי האוזניים שמיעה בתחום הנורמה, בתדירויות הגבוה שמיעה סימטרית ותואמת את המצופה בגיל. בבדיקת ETF עם תור תוך שלם: הקבלה היענות הקטנה מ-15daPa, בעקבות שינוי לחץ בבליעה. תוצאה זו תומכת בתת תפקוד של ET דו"צ.

המלצות:  - מופנה לרופא אא"ג המטפל להמשך בירור וטיפול
- המשך מעקב שמיעתי כמידת הצורך

קליניאיות תקשורת

תוכנת קלינפון פותחה על ידי מרכז מערכות תוכנה בעמ טלפון 02 6527501

APPEAL RESPONSE EXHIBIT 1 - DR. WOLFOVITZ




ד"ר עמית וולפוביץ'
מומחה ומנתח א.א.ג כירורגית-ראש וצוואר
מומחה באוטולוגיה/נוירואוטולוגיה
(ניתוחי אוזניים, שיקום שמיעה, סחרחורת, טינטון
וניודולי בסיס הגולגולת הצידי)

24.4.25

**שם: ארי תימן**
**תאריך לידה: 10.5.1982**
**ari@teman.com :Email**
**כתובת: ת"א**
**הצהיר/ה שלא נפגשנו במסגרת מערכת הבריאות הציבורית בחצי השנה האחרונה**

**סיבת הפנייה:**
לפני כחודשיים עבר טיפול בתא לחץ בשל סימפטומי GI. ככל הנראה סבל מצינון ללא קושי
במהלך ה"צלילה". למרחת החל לחוש לחץ באוזן ימין, ללא שיפור בבליעה, ללא שינוי
בשמיעה, ללא טינטון או סחרחורת, נמשך עד עכשיו. טורדני. בחשיפה לרעש בעיקר בתדר
נמוך – אי-נוחות ואף כאב ללא סחרחורת.
ללא קושי בהשוואת לחצים (טיסות וכדומה).

דלקות אוזניים בילדות:
24.4.25 – השלים בדיקת שמיעה + טימפנומטריה + ETF שמיעה תקינה למעט ירידה ת"ע
סימטרית ב-UHF עד ל-50 ד"ב. WRS 10/10SRT 96/92%. טימפנום A/A. בבדיקת ETF-
תת-תפקוד חצוצרה דו"צ.
פחות חמור משהיה כאשר פנו.

**בדיקה גופנית:**
פנים – סימטריות
אוטוסקופיה – תקינה משני הצדדים. תנועת תופית תקינה בולסלבה וטוי"נבי משני הצדדים.
וובר לשמאל, רינה + משני הצדדים אך נשמע יותר משמאל
ללא ניד ספונטני, HIT – תקין דו"צ, HST – תקין, SKEW תקין, VOR דו"צ תחת פרניל –
תקין
24.4.25 – אוטוסקופיה – תקינה משני הצדדים עם תנועת תופית בולסלבה

**רקע רפואי:**
ללא

**רקע ניתוחי:**
ניתוח לשחזור האף, אוטופלסטי

**אלרגיה לתרופות:**
פניצילין

**הרגלים:**
ללא

**סיכום והמלצות:**
תמונה חלקית של תת-תפקוד חצוצרה מימין עם קושי בהשוואת לחצים אך בבדיקה תקין
סה"כ.
בנמסף, וובר לשמאל ואי-סבילות לרעש בתדר נמוך
מומלץ:

1. המנעות מטיסה ל-3 חודשים avoid airplanes for the coming three (3) months
2. בדיקת שמיעה בהקדם + טימפנומטריה + ETF – ישלח לי את התוצאות ל-
058-6268313
24.4.25 –

The Eustachian Tube (ET) Function test point at ET Dysfunction Bilaterally Hence Ari Should avoid barometric changes (for example: commercial flights, climbing to high places, HBO chamber, etc.)
I would prescribe Steronase nasal spray for 3 months and would schedule visit for inspection before approving traveling abroad. In case of increasing pain – come in sooner.

Dr. Amit Wolfovitz
ד"ר עמית וולפוביץ
מ.ר 108124 / מ.מ 33387
מומחה אא"ג וכירורגית ראש-צוואר

ד"ר עמית וולפוביץ
מ.ר 108124
מ.מ 33387

B"H

To the Court,

Mr. Guttwillig makes the argument that Dr. Wolfovitz's medical records are not easy to translate but the relevant record from Dr. Wolfovitz is in plain English.



For the benefit of those reading the plain text, it says very plainly in English:

**"Eustachian Tube (ET) Function test point at ET Dysfunction Bilaterally"**
**Hence Ari Should avoid barometric changes (for example: commercial flights, climbing to high places, HBO [(Hyperbaric Oxygen Chamber)] chamber, etc.)**
**I would prescribe Steronase nasal spray for 3 months and would schedule visit for inspection before approving traveling abroad. In case of increasing pain - come in sooner.**

**Dr. Amit Wolfovitz**
**(Licence Numbers)"**

The other records, in plain English, verify via third parties I have been truthful about my medical conditions, financial state.

More importantly, the recently filed Exhibits by Mr. Butler confirm that I was truthful that the terms in effect at the time the clients signed up allowed these drafts and that trial counsel was provided them and lied to the court about not having them. I did not "Structure" the terms and did not "bury" the provisions allowing these drafts, and I did provide them to trial counsel. As Mr. Butler points out, multiple State and Federal judges have since upheld these very same Dispute Terms which remained unchanged from 2016 to into 2020 (after this trial). I am innocent, and the Court should release me immediately to remain with my family and get medical care recommended by the doctors.

**Conclusion**

The doctor's notes are in **plain English** that he does not approve me traveling, and Eden's email is in *plain English* that he would take up this matter if I could afford it and it is clear that my father and I could not afford to pay him -- so in consideration of those plain English facts:

(1) grant me the 90 days the doctor ordered and

(2) reconsider my motion for IFP and grant IFP status for appeals.

If the Court is confident in its rulings, it will have no fear in allowing my appeals to be heard and not try to block a man whose finances have been devastated by this case from having his arguments heard. Instead, it uses some Soviet-style technicality to count one *consolidated* appeal as 3 and demand nearly $2000 ($1815!!!) for my arguments to be heard.

s/Ari Teman/
Ari Teman
Pro se


14 May 2025,
16th of Iyyar, 5785

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

-v-

ARI TEMAN,

Defendant.

---

19 Cr. 696 (PAE)

ORDER

PAUL A. ENGELMAYER, District Judge:

This order addresses the deadline for defendant Ari Teman to return to the United States.

## I.    Background

On January 24, 2025, this Court ordered Teman, who is presently in his first year of a three-year supervised release term following service of a 12-months-and-one-day prison sentence on two counts apiece of bank and wire fraud, to return to the United States by February 28, 2025. Dkt. 484. As of then, Teman had been in Israel for four-and-a-half months, with the Court's permission. As the Court, supported by the United States Probation Office ("Probation"), explained, Teman's return to the United States was important, to enable Probation to meaningfully supervise him, in particular, with respect to the special condition of supervised release requiring Teman to obtain mental health treatment. *Id.* at 7. The Court, however, *sua sponte* extended the deadline for Teman's return (then, January 29, 2025) to enable Teman (and Probation) to plan for his return, to enable Teman to investigate economical air travel options, and to give Teman time to appeal the order to the U.S. Court of Appeals for the Second Circuit should he choose to do so. *Id.* at 9–10. The Court emphasized that its order was final, that it would not alter the February 28 deadline unless ordered to do so by the Second Circuit, and that

if Teman were to fail to return that day, he would be in violation of the supervised release condition prohibiting unauthorized international travel. *Id.* at 10.

Following that date, Teman, who is otherwise represented, instead repeatedly moved, *pro se*, for sanctions and for the Court's recusal, recycling claims of misconduct rejected by Second Circuit in its June 2023 summary order affirming Teman's convictions for wire and bank fraud. *See United States v. Teman*, No. 21-1920-cr, 2023 WL 3882974, at *3 (2d Cir. June 8, 2023) ("There is nothing to Teman's argument that Judge Engelmayer was required to recuse himself[.]"). The Court denied these motions as meritless. *See, e.g.*, Dkt. 514 (denying motion at Dkt. 513); Dkt. 498 (denying motion at Dkt. 496); Dkt. 480 (denying motion at Dkt. 478); Dkt. 477 (denying motion made by email).

On February 24, 2025, Teman, *pro se*, moved anew for relief from the Court's January 24, 2025 order, contending, for the first time that his return to the United States would be medically contra-indicated. *See* Dkt. 502. In support of this late argument, Teman attached a brief doctor's note from a Maurice Budow, MD, dated February 24, 2025, stating that, although Teman was "well," the change in air pressure caused by air travel could trigger his chronic sinusitis and cause acute sinusitis, and that his guidance is that Teman not fly for eight weeks. Dkt. 502-1. In an order the same day, the Court noted that Teman, with the Court's permission, had repeatedly engaged in air travel since his conviction in January 2020, including having flown to and from Australia to perform comedy while his appeal was pending and to Israel while on supervised release. *See* Dkt. 503. The Court directed the Government to investigate Teman's claim, including by determining, through inquiry of Dr. Budow, the extent to which the doctor had been aware, prior to signing the note, of Teman's prior plane travel and the impact, if any, it had had on his sinusitis. *Id.* at 1–2. The Court also directed Teman, by the following day, to file

2

records documenting the plane ticket, if any, that he had purchased to enable him to return to the United States by February 28. *Id.* at 2.

In a letter response filed on February 26, 2025, the Government explained that it had determined from public records that Dr. Budow is a doctor based in Israel. *See* Dkt. 506. However, the Government stated, it was unable to obtain the information requested by the Court or confirm Teman's representations about Dr. Budow's diagnosis, given limitations on evidence-gathering abroad. *Id.* at 1. The Government confirmed with Teman's Probation Officer that Teman had not provided him with any such documentation. *Id.* The Government urged the Court either to adhere to its order that Teman return to the United States on February 28, 2025, or direct Teman to produce supplemental medical records corroborating his claim. *Id.* at 2. Early on February 27, 2025, Teman, *pro se*, replied, demanding that sanctions be imposed on the Assistant United States Attorney who authored the letter. Dkt. 507.

In a lengthy order issued February 27, 2025, the Court expressed its firm view, with the Government, that Teman's proffered medical excuse for not complying with the Court's order to return to the United States tomorrow is a pretext. Dkt. 508 (the "February 27 order"). "Every indication," the Court stated, "is that Teman is advancing this rationale for not traveling to the United States in a last-ditch effort to avoid return, which he has repeatedly stated he does not wish to do." *Id.* at 3. Evidence of this, the Court stated, were that (1) as of February 25, 2025, Teman had not purchased a plane ticket for a trip he had been ordered to take by February 28, 2025; (2) alongside the medical excuse, Teman articulated a series of frivolous alternative bases why he purportedly could not travel to the United States; (3) Teman's doctor's note pronounced that, as of February 24, 2025, he was "well" and did not represent that Teman had sought out a medical opinion regarding the compatibility of air travel with his sinusitis condition until four

3

days before the deadline for his return; and (4) then-recently filed sworn affidavits submitted by

Teman's two trial counsel, Joseph DiRuzzo, Esq., and Justin K. Gelfand, Esq., in connection with

Teman's pending motion pursuant to 28 U.S.C. § 2255, had refuted as factually untrue numerous

representations Teman had made to the Court, and had reported an attempt by Teman—rebuffed

by his ethical counsel—to arrange for an anonymous call to be placed from a burner phone to the

Federal Bureau of Investigation falsely claiming that a juror at his trial engaged in misconduct;

and (5) the overall case record "reveal[ed] a regrettable but persistent pattern of Teman's making

demonstrably false and self-serving statements and accusations." *See id.* at 3-4 (citations

omitted).

The Court's February 27 order stated that, although the Court would be well within its

discretion to deny Teman's application as contrived, in the interest of due care, it would seek out

additional evidence bearing on Teman's claim to be unable to safely fly due to recent sinusitis.

*Id.* at 4–5. The order extended Teman's return date until March 21, 2025, while setting deadlines

for Teman to file designated medical records, chronicle his plane flights since 2015 and identify

any medical complaints arising from them, and purchase a plane ticket for return to the United

States. The order also notified the Government that, on receipt of Teman's medical records, it

would likely be asked to obtain an independent assessment by a qualified medical professional,

*id.* at 5–6.

Teman partly complied with that order. On March 5, 2025, he filed a letter from Dr.

Budow stating that he had examined Teman on February 22, 2025, and had concluded that

Teman had injured his ear during hyperbaric oxygen therapy on January 22, 2025. Dkt. 513 at 6.

Dr. Budow now opined that Teman should not fly until June 1, 2025. *Id.* However, as the Court

noted in an order the next day, Teman had not attached any records of Dr. Budow's examination;

4

the Court directed Teman to file those by the following day. Dkt. 514. On March 10, 2025, Teman filed a one-page letter, which he stated, reflected his having had "hyperbaric oxygen therapy" on January 22, 2025. Dkt. 518-1. Teman also filed records of his medical care for an unrelated condition in 2024, while incarcerated. *Id.* at 518-2–4. However, notwithstanding having been ordered to do so, Teman did not file underlying records of his examination by Dr. Budow; chronicle his prior plane travel, save flights he had taken during his term of supervised release; or produce evidence of his having purchased a plane ticket to return to the United States by the deadline the Court had set. Instead, in what the Court understood to express a refusal to return, he stated that he "must remain in Israel until . . . Engelmayer is impeached and this case is dismissed with prejudice." Dkt. 518 at 2.

Since Teman's March 5, 2025 letter, the Court has extended his return date several times, at the Government's request, to enable it to secure an independent review of the medical records Teman had provided. *See* Dkt. 522 (extending return date to April 11, 2025); Dkt. 524 (extending return date to April 25, 2025); Dkt. 529 (extending return date to April 29, 2025).

On April 15, 2025, the Government filed a letter, Dkt. 530, attaching a report from Dr. Richard Nass, a specialist in otolaryngology and sinus issues, *id.*, Exh. A. Dr. Nass's evaluation noted that the medical records Teman has provided did not squarely address his claimed otolaryngological issues. *Id.* Teman, Dr. Nass noted, had seen only an internist (Dr. Budow). *Id.* Dr. Nass further noted that, although hyperbaric oxygen treatment can cause complications to the middle ear, which increase the risk of injury during air travel, "evaluation and management by an otolaryngologist can accurately make a diagnosis, assess the risk involved in the individual case," and "make air travel safe for the affected ear." *Id.* Teman, however, had either not seen a doctor with that specialty or produced records of such an

[Page 36]

evaluation. As a result, Dr. Nass stated, the limited records Teman had supplied do "not allow a definitive answer as to whether Mr. Teman can safely fly at this time." *Id.*

The Government's letter stated that Teman's failure to submit relevant records had left Dr. Nass, and the Government, unable to render an opinion whether air travel was safe for Teman. Dkt. 530 at 2. It stated that it questioned "the motivation and provenance of Teman's claims." *Id.* It noted that Teman had agreed to jointly proposed conditions regarding international travel during his supervised release term but thereafter had repeatedly made motions to stay in Israel well past his original proposed return date of November 6, 2024. The Government stated:

> In view of that timeline and the content of the medical records Teman has submitted that he claims, show that it is unsafe for him to fly, the Government maintains its view that Teman is using claims about his medical conditions as a pretext to stay in the Israel and not serve his remaining term of supervised release. By submitting incomplete and irrelevant records, Teman has managed to create a circumstance where, as Dr. Nass' report concludes, it is not possible to determine whether what Teman claims is true; and indeed, Teman theoretically could continue to make such claims, whether or not based in fact.

*Id.* at 2. Nonetheless, the Government stated, because it was constrained to defer to the inconclusive determination in Dr. Nass's report and did not wish to jeopardize Teman's health, it had chosen "not to object to extending the deadline for Teman's return until June 1, 2025, the date by which Teman claims it will be safe for him to fly." *Id.* The Government, however, urged that no further adjournment of that date be granted. *Id.*

## II.    Order

The Court extends, until June 1, 2025, the date by which Teman is required to return to the United States. That is the date before which Teman's internist, Dr. Maurice Budow, recommended Teman not fly. The Court extends the return date based on the assessment of Dr. Nass, the independent medical expert. As Dr. Nass explained, the limited paperwork

6

submitted by Teman—which did not include any assessment by a relevant specialist, like an otolaryngologist—"does not allow a definitive answer as to whether Mr. Teman can fly safely at this time." Dkt. 530, Exh. A at 2. The Court, like the Government, does not wish to jeopardize Teman's health. The Court therefore will extend by 33 days the deadline for Teman to return to the United States from the present April 29, 2025 deadline. It is undisputed that as of June 1, 2025, Teman can safely return.

That said, the Court's firm conclusion—along with the Government —is that Teman's claim that air travel is medically risky is pretextual. Numerous data points support that Teman invoked this in late February as a last-ditch excuse to avoid returning to the United States. These include those chronicled in detail in the Court's February 27 order; Teman's failure to abide by Court's orders to make a plane reservation for a return trip; Teman's non-compliance with other aspects of this Court's recent orders; Teman's offer of other bogus rationalizations for not traveling; and Teman's well-documented pattern in this case—now confirmed by the affidavits submitted by his trial counsel—of proffering bogus claims and accusations to suit his self-interest.

*Accordingly, the Court orders Teman to return to the United States by June 1, 2025.* A breach of this order will be a breach of Teman's conditions of supervised release, inasmuch as Teman is authorized to travel and be abroad only to the extent of advance authorization by the Court. *See* Dkt. 453, 454. Teman is reminded that, as with any defendant, an adjudicated violation of a condition of supervised release can have a range of serious consequences. *See* 18 U.S.C. § 3583(e)(2)–(3), (h)–(i).

For avoidance of doubt, the Court does not restrict Teman in his mode of travel home. Teman may choose air travel, which he has often used in the past, as such is faster and less costly

7

than the alternative. But, provided that Teman has complied with his obligation to obtain advance authorization of international travel set out at Docket 454, Teman is at liberty to arrange return travel to the United States by boat, whether departing from Israel or a port elsewhere. The Court will therefore not honor, as a basis to further delay return, a claim by Teman that—contrary to Dr. Budow—air travel on or after June 1, 2025 would be medically contra-indicated.

*The Court further orders Teman, by May 9, 2025, to file on the docket of this case documentation sufficient to show reservations he has made for return travel to the United States on a date consistent with this order.* Teman is at liberty to make refundable reservations, so as to enable him thereafter to secure more favorable price terms for travel within the deadline set above.

SO ORDERED.

Paul A. Engelmayer

PAUL A. ENGELMAYER
United States District Judge

Dated: April 17, 2025
New York, New York

8

## D. Venue Evidence

This is only for context to assist the court in ruling in the interest of Justice and the law

Ari Teman  1:43
Hey, how are you? Hello,

Akash Kazi (ex Signature OASIS)  1:48
Hey, how are you? How's everything?

Ari Teman  1:49
Hey, good, good to meet you. Where... It looks like you're in a car.

Akash Kazi (ex Signature OASIS)  1:54
Oh, yeah. I wasn't expecting this call, but I was charging my car, so,

Ari Teman  1:58
oh, you got an EV, I guess it looks like maybe a Tesla from the glass

Akash Kazi (ex Signature OASIS)  2:03
From the glass roof? Yeah, haha, it is.

Ari Teman  2:07
How do you like the Tesla?

Akash Kazi (ex Signature OASIS)  2:10
 It's really irritating because I don't have the charger at home yet.

Ari Teman  2:13
Ah, yeah,

Ari Teman  2:17
yeah. But, but other than that, once you get the charger at home, then it's, then
it's, I guess, much more convenient.

Akash Kazi (ex Signature OASIS)  2:24
Yeah, it is. It's just that I had to do a pit stop in a mall and pay the entrance to
get in, to pay to charge. So, oh yeah, I wasn't around like a free acts like,
without a mall. You know what I mean? You know, some malls have parking like,
charges to park in a mall.

Akash Kazi (ex Signature OASIS)  2:44
Where is this in New Jersey or

Akash Kazi (ex Signature OASIS)  2:47
no, this is in Queens.

Akash Kazi (ex Signature OASIS)  2:48
Oh, in Queens. Okay, interesting. Yeah, you're based, you're based in Queens,

Akash Kazi (ex Signature OASIS)  2:53
yeah, I am.

Akash Kazi (ex Signature OASIS)  2:54

Okay, cool, cool.

Akash Kazi (ex Signature OASIS)  2:56
And you were at, you were at, yeah? No, I, I lived in the city, and it's, it's same
when I was living in Miami Beach. It's like, you got to go into some parking lot for
an EV and sometimes Tesla makes a deal with them where you get like, 30 minutes free
in the parking lot so you're not paying. And sometimes, yeah, you end up paying more
to come in and out of the parking lot than for the charging.

Akash Kazi (ex Signature OASIS)  3:18
 Yeah,

Akash Kazi (ex Signature OASIS)  3:19
 so, so I guess you had an interesting few years, right? Because you were at
Signature, which obviously is no more, but, but you're still, you're at the same
bank, and they just changed names, or you went on to a different?

Speaker 1  3:35
No. So what ended up happening is that Signature shut down, and then I didn't work
for about two years. I focused on school, so I just finished my Associates, and in
between, I got a job at Teachers Federal Credit Union.

Ari Teman  3:50
Okay,

Akash Kazi (ex Signature OASIS)  3:51
So I've been at teachers as like an assistant manager slash supervisor for the
retail side.

Ari Teman  3:57
 Okay,

Ari Teman  3:58
 but what I mainly focus on here. It's mainly operations and sales, making sure that
whatever accounts that are being opened, all the proper documents are there, making
sure we're meeting our sales targets, and then making sure that all the paperwork
and everything aligned with the regulatory or, if it's like an NRA account, making
sure everything is in order, if it's a business account, making everything is in
order. So I'm kind of in charge of the reports, reporting back to the back end and
all that stuff,

Ari Teman  4:32
going through a ton of data, and making sure that all the check boxes are checked
and that nothing looks out of place and correct you were, you were doing that
before, too, where you were on the Oasis team at Signature?

Akash Kazi (ex Signature OASIS)  4:45
Yeah, at Signature, I did oasis. So basically that was our main focus. So, you know,
prevented, sorry, prevented incoming and outgoing threat through like checks or even
wires and ACH payments. So we just looked at 1000s and 1000s of checks and

transactions that was coming in and out the date prior. So we worked. We didn't work live. We worked for the day prior. Okay,

Ari Teman 5:13
you're not lurking live. Day prior means the transaction already closed.

Akash Kazi (ex Signature OASIS) 5:18
The transaction already went through the clearing house, and then it posted, and then it's coming to us as the last step of verification. And if not, then it goes back to basically the feds. And then the Feds communicate with the bank of first deposit to return that order. They'll return that check or wire whatever it is.

Ari Teman 5:38
But the when you say verification, return that check. So if you're looking at it, the day after the money is already cleared, I'm just, this is just interesting to me, based on what you said, right? Like, so somebody, somebody goes to, let's say, Bank of America, use the big bank, and not the signature was tiny, but relative. So they go to Bank of America, they deposit a check on a signature account on Monday morning. Everything's computerized, so they deposit a check for $500, $5,000, that money, it goes from the Signature account into the Bank of America account on Monday that same day, right? And then you guys are reviewing it on Tuesday.

Akash Kazi (ex Signature OASIS) 6:25
Umhum.

Ari Teman 6:26
And then on Tuesday, if you notice, hey, wait a minute, the information here is wrong. The checking number, this checking account,

Akash Kazi (ex Signature OASIS) 6:33
 yeah,

Ari Teman 6:34
 you know, there's some fraud or whatever. So really, what you're doing is you're reversing the transaction. You're not, because the transaction already went through the day before, or you're doing a final verification, and then the transaction goes through.

Akash Kazi (ex Signature OASIS) 6:47
No, So how the process works is that? So you go, go into Bank of America, and you deposit this check, right, right? Depending, depending on that dollar amount, let's say it is $5,000 right there, it has to go through a clearing process. So I don't know if you ever, like, if you ever deposited a check, they'll take they'll tell you, like, oh, it takes five to seven business days. It takes five to seven business days because it goes through the back end, through the Feds and through the first bank deposit or the second bank, because it's going through the clearing process. So a $5,000 check would release incrementally, right? So like, let's say 250 would be available immediately. The next day 500 then the next day, like 50% and then the last day would be the final amount. So within those days, that's when the research is being conducted. So that's when it would come up over to us overnight, and our

job would really be to clear it that same day, so we would reach out to our like
client, be like, Hey, did you write this check to Robert? And if they say, No, we
decline it, and that information gets translated over, and then the check doesn't
get cleared.

Ari Teman   7:55
Okay? But within that let's say that week. Let's say they put a week, even a week
hold, and they say "we're holding this check for a week." And then, okay, I guess in
that week, if it's a large amount you got with Signature, always going to a client
and saying, Hey, this is a large check. Did you

Ari Teman   7:55
 No.

Ari Teman   8:04
Okay, so sometimes you don't do anything. The check clears, right? It's a client.
They often write big checks. They're a landlord, a major business, whatever, so it's
not out of whack for them to write a big check and then they but if they come back
to you two weeks later and say, Hey, I didn't authorize that check, is that Oasis?

Akash Kazi (ex Signature OASIS)  8:39
No,

Ari Teman   8:39
A different department?,

Ari Teman   8:42
let's see. Doesn't get flagged by Oasis so it goes through the oasis system. And
you're saying basically, Oasis is just the first week of the check?

Akash Kazi (ex Signature OASIS)  8:51
 yeah.

Ari Teman   8:52
 And then after that first week, if, if, let's say Joe Schmo client says, "Wait a
minute, this check, I didn't authorize this check, or this Ach, or this RCC,
whatever this draft." When they email their banker, they call their banker and they
say, Hey, I didn't authorize this check, or they go online, whatever. That's a
different department of signature. That's not Oasis?

Akash Kazi (ex Signature OASIS)  9:20
no, it's not. that would go through the retail side. So for a retail side, I'm not
sure how it worked for signature, but for teachers, what would happen is that you
come in and you put a stop payment on that check.

Ari Teman   9:30
They got to do a local branch

Akash Kazi (ex Signature OASIS)  9:34
for teachers. Yes, I don't know. I didn't work for the front end. So once we were

done with Oasis, that was it,

Ari Teman  9:40
okay, but in signature, if a guy's offices in Brooklyn, and he just

Ari Teman  9:44
 probably that

Ari Teman  9:44
Exactly, he's got to go to signature in Brooklyn and say, hey,

Ari Teman  9:48
yeah,

Akash Kazi (ex Signature OASIS)  9:49
okay,

Speaker 2  9:51
where would so and you guys signature, I, because I we've spoken to some guys at
signature. So signature is actually running their operation. Is where New Jersey and
in Brooklyn or?

Akash Kazi (ex Signature OASIS)  10:02
no signature is, I think, still running through by Herald Square. This, that's where
I worked. They have a main office there that they consolidated all the other
buildings in the city, but flagstar is what took over. And I think flagstar
headquarter is in somewhere in Long Island. But from what I heard, in, yeah, in Long
Island. So from what I heard, they're trying to transition everybody from Manhattan
over to Long Island. So I think they're just trying to make, uh, headquarters Long
Island for

Ari Teman  10:33
everything. But three or three or four years ago, Oasis was sitting in by her old
square, yeah, not, not in Wall Street because it was in signatures headquarters down
downtown, right by by Wall Street.

Akash Kazi (ex Signature OASIS)  10:52
No, we didn't have any offices there. All of our offices were surrounding area of
midtown, so we had one by like Park Avenue and then by Madison Avenue, and then
where I worked, and I think one more building, I'm not sure, but nothing around Wall
Street that I know of, but Oasis definitely sat in Herald Square.

Speaker 1  11:11
Okay, Oasis is in Herald Square. Okay, that makes sense.

Ari Teman  11:15
 And then, and then, how much of the fraud review is automated. Meaning is the
computer popping up, because obviously tons of checks are coming in, right? So you
see $20,000 check come in, the system has to flag for you the check, right? But if
the system just goes, Yeah, this is an RCC, and it's, you know, within the range of

the amount that this client pays. That's automated, right?

Ari Teman  11:44
Yeah.

Ari Teman  11:44
So the actual review is happening by a computer system, not by a human being.

Speaker 1  11:50
No, most of the most of it is probably be, we don't know what, how many is being
approved by the system itself, but we know what's being rejected. So the amount
that's rejected can be, sometimes it varies from like 15,000 10,000 20,000 checks,
and then it gets divided up by branches.

Akash Kazi (ex Signature OASIS)  12:08
So what would happen is that my team would be assigned to a certain amount of
branches, and they would go in and review it right so we would see if the signature
you could have paid this check before but if the signature off is off, it would flag
it. Or if the writing is off and the computer can't read it, we would have to
manually review that. If the dollar amount and then the written amount doesn't
match, we would have to review that. So you could have written that.

Ari Teman  12:35
That's like image recognition, where it's saying, Hey, I have 10 checks that this
person's written before, and this is a different signature, but if it's like an RCC
or an ACH, right, where it's not signature based and it's not handwritten, right,
it's computer ACH is obviously just like a text upload to some computer system, and
an RCC is a printed check, right? So you're not going to see a signature, yeah, so
in that case, it's just an automated system, a computer system that says, this is an
RCC, this is $1 amount.

Ari Teman  13:08
And would RCCs even get flagged by oasis?

Akash Kazi (ex Signature OASIS)  13:12
It would if it's like the dollar amount is like out of the ordinary, or you always
don't do a transaction, and now you're doing this kind of transaction. Or if for
like an ACH, let's say it's out of your area, right? So if it's in a whole different
location, then it would flag it as well,

Ari Teman  13:31
meaning you send money somewhere in the country that you normally don't send money,
yeah, just like when you're traveling with a credit card and you are you flying
overseas? Did you just buy something in France? Right? Exactly.

Akash Kazi (ex Signature OASIS)  13:44
So we would have to go in and see if you did put a travel notice on your card. If it
is, then we would go and approve it. If not, then we won't. We would have our we
don't. We would relay it to the member, well, to the client, and then, if not, we
would get in touch with this, like designated banker, and the banker would would get

in touch with them and then clear it, okay,

Ari Teman  14:06
but it, but it, but in the sense of, if a transaction goes through in that first
week, then that means that Oasis didn't touch the not that it necessarily. You could
have reviewed it and approved it, but, but basically, if a transaction goes through
in that in that first week with it, without a phone call or an email to a client,
let's say the dollar amount is out of what, let's say somebody does a ACH or An RCC,
right for a client, $18,000 check, and the it just goes through, right? Their
account is drafted, yeah, so, and there was no call or email from Oasis to that
client. So that just means there was an automated system. Nobody reviewedit,

Akash Kazi (ex Signature OASIS)  14:57
most Possibly, yeah,

Ari Teman  14:58
right? Because otherwise. Is if it was flat. In other words, if Oasis flags, it is
it 100% of the time that you'll then Oasis says this, this is an out of the ordinary
amount. So then 100% of the time an oasis team will reach out to the client,

Akash Kazi (ex Signature OASIS)  15:14
 yeah

Ari Teman  15:15
okay, but that's 100% of the time, meaning, if there's an $18,000 check, that's a
significant amount of money, even for a multi million dollar client, right? This is
not a small it's not a $500 check for someone to come clean the apartment or
something, right? So... that's pretty high for cleaning apartment, but let's say,
Okay, it's a big apartment. You're a landlord, so, so Okay, $18,000 check system
clears it. There was no email to the client. Then that, that means there was no no
human in sitting in Manhattan that reviewed basically, if it clears without
intervention, that means no human was involved in the review of the of the
transaction.

Speaker 1  15:58
Yeah.

Ari Teman  15:59
Okay, interesting, interesting. And then, but you're saying like, 15,000 checks.
That's a week a month that you guys were to review,

Akash Kazi (ex Signature OASIS)  16:10
no per day,

Ari Teman  16:11
 15,000 per day that you would review, that a human would review,

Akash Kazi (ex Signature OASIS)  16:15
 yeah, well, the whole team. So

Ari Teman  16:17
how big is? How big is the team that's a lot of people sitting in Herald Square in New York City.

Akash Kazi (ex Signature OASIS)  16:22
 It was like about eight or 10 people. But what would happen is that that was our main focus, so we would have basically all day to complete that, right? Well, not all day, because there's a cut off time for the Feds that they can report back, so we would have most of the day to complete that. So then it would get broken up by by branches, right? So like branches, one through 10 is, let's say John's right. Then 10 through 20 is Elizabeth. So then they would have that time frame to go in and complete it. But what would have, what would Oasis also do, is that they would pull up a reference check as well. So you don't need to necessarily, all the time, call the member, call the sorry, we call our clients, members. So now I say members, yeah, so like, like, we wouldn't necessarily need to reach out to the member and be like, Hey, did you actually write this check? Right? So if we would go in and sign the sample signature matches the signature the check that's being pushed out right now.

Ari Teman  17:27
Okay, so the vast majority of these are like, you know, the guy,

Akash Kazi (ex Signature OASIS)  17:31
 minor discrepancies,

Ari Teman  17:31
minor like, signature. The guy was tired, he was wearing gloves in the winter, and his signature looks different.

Akash Kazi (ex Signature OASIS)  17:35
yeah,

Ari Teman  17:36
 and you have a lot of discretion there to go. Yeah, that's clearly he signed it, or it's close enough, right?

Akash Kazi (ex Signature OASIS)  17:43
Yeah, it is

Ari Teman  17:44
 okay, great.

Ari Teman  17:45
And then, so then for an RCC, the only real flag would be the amount or the or the zip code or something, right? Like, it's

Akash Kazi (ex Signature OASIS)  17:54
just those we would most like most of the time, reach out, just because those are more like real time, not really real time, you know what I mean? Because they would, we would only have, like, the, like the day prior to accept it or not accept it

Ari Teman  18:10
for an RCC, it has to clear in the day.

Ari Teman  18:12
Okay, interesting. So basically, in the first 24 hours that an RCC, if a guy, even
if they, even if the the, let's say the vendor, their bank, is going to hold the
money for a week. That doesn't matter , if they deposit it. Let's say, okay, Friday
morning. It's but you have until Monday night to stop that check, or you have until
Friday evening.? other words, let's say they walk in nine. Nine in the morning, 10
in the morning. Let's make it easy. Let's say noon on Friday, middle of the day,
they walk into their Bank, Bank of America, they deposit an RCC against a signature
account, right? You're saying you have a day. Does that mean from noon on Friday
till 5pm on Friday, or does that mean till noon on Monday?

Akash Kazi (ex Signature OASIS)  18:56
So basically, noon on Monday,

Ari Teman  18:58
 okay, but, but come 1pm on Monday, if you guys haven't reviewed it, then there is
no oasis. Review of that check of that RCC?

Akash Kazi (ex Signature OASIS)  19:08
no, everything must be reviewed.

Ari Teman  19:10
No, but what I'm saying is, let's, let's say that the check comes in. Let's say the
noon on Friday to noon on Monday, right? If the computer system doesn't flag it for
you, then for an RCC, it's only 24 hour 24 business hours, so to speak, basically.

Akash Kazi (ex Signature OASIS)  19:30
 Yeah,

Ari Teman  19:31
 Okay, interesting.

Ari Teman  19:32
And then let me ask you this, because this is the thing so, so I kind of our concept
is sort of like an escrow system for payments between vendors and property managers,
right? And one of the things that we hear a lot and see a lot and it's it's pretty
when I say it, you'll be like, Yeah, is that it's not just New York City, but but
one of the reasons we're looking at folks who have experience in New York is that
it's the volume. Is there a plumber, let's say, is hired to come fix a broken pipe
in a building, toilet, whatever, right? He gets a check from the landlord or
property manager, or he gets a, you know, he had us form like authorizing a RCC or
an ACH. And then the the word charge back is, is, it's like a horror movie word to
vendors in New York City. So what we hear is that, you know, the guy who's
installing the the intercom or the or the electric repair or the plumber. One guy
was saying that his father, for years, would deal with this. He was a plumber. He
would like renovate the bathrooms when they would get a vacancy, which doesn't

happen anymore in New York, but back when they got vacancies, he would do all the work, and then they would stop the check, or they would do a charge back and say, Oh, the tile was in whatever, right? And the guy couldn't feed his kids. So what happens in the reverse in the sense of, was it ever the case where, let's say, on the Oasis team, the client knows that, you know, would they even get a notice in the first 24 hours of the RCC, or they only get a notice after it's cleared.

Akash Kazi (ex Signature OASIS)  21:24
They get a notice after it's cleared.

Ari Teman  21:26
Okay, so the first 24 hours, they basically have no unless the vendor says, I'm drafting an RCC today. They have no idea that an RCC is coming.

Ari Teman  21:34
Well, if they sorry

Ari Teman  21:36
, let's assume nobody warned them, right? That the vendor walks into the bank, he's got a contract that allows him to draft $5,000 in an RCC. goes into his Bank of America. He drafts the $5,000 and the client has no idea. So then Monday at noon, if he drafted it, Friday at noon, Monday at noon is the first time the client is going to hear about this. RCC? okay,

Akash Kazi (ex Signature OASIS)  22:06
No, because they could have triggered a fraud alert as well,

Ari Teman  22:10
a fraud alert by signature, by signature? Yeah, that would be the Oasis team, or that's a different

Akash Kazi (ex Signature OASIS)  22:16
No, that would be a whole different team, because we also had a fraud department.

Ari Teman  22:20
Okay, so, and the fraud department's in the same building, same building,

Akash Kazi (ex Signature OASIS)  22:24
yeah.

Ari Teman  22:24
 Okay, so everybody's sitting in Manhattan, fraud department sees that an RCC was drafted. The the reviewing of the actual RCC is the Oasis team?

Akash Kazi (ex Signature OASIS)  22:37
No. So, like, let's say you would get a fraud notification for something, right? So let's say $500 was reported as fraud. It would trigger it, but it would go to the fraud department, right? Because it was triggered fraud, and they would go and confirm if it's yes or no. So they would take care of it.

Akash Kazi (ex Signature OASIS)  22:54
But what would happen is, let's say Oasis comes to let's say, let's talk, let's say
about Oasis, right? So let's say a check comes through, the signature is little off,
and I feel not okay to clear this check. I reach out to the member to be like, Hey,
did you write this check? If they say, No, then we draft a form that says, Oh, this
is a fraud transaction. We take that check, we remove it from the queue, and we send
it over to the fraud department. So we're not actually filing these fraud
transactions.

Ari Teman  23:24
 Okay. So to simplify it, Oasis is kind of like an image recognition team, right?
There's computer software that says to you, this looks off, right? And a little bit
more than image recognition. Hey, they've never sent a check to Texas. This is the
first check for this account going to Texas from Brooklyn. That's strange. Call them
up and see if they got a vendor in Texas. Or hey, they normally don't write a check
for $18,000 they normally write $500 checks. Call them up and see if they wrote a
big check. Right?

Ari Teman  23:56
So then and then, you don't actually make a decision as to whether it's fraud or
not, your call, you're then forwarding it based on what the client said. Client
says, yeah, no, I didn't approve this. Then you just you click that in the computer,
and it gets sent to the fraud review department. So

Akash Kazi (ex Signature OASIS)  24:18
sorry, we have to draft a form, and then we report it to the fraud department.

Ari Teman  24:21
Okay, so you draft the form. Now, the client fills out the form, and others, you
send a form to them.

Akash Kazi (ex Signature OASIS)  24:26
We draft the form. We send it to the client. They sign off on it, then it comes back
to us, then we get it back to the fraud department,

Ari Teman  24:32
okay, and the client is sick, but the but the client saying, I never did business
with you. I don't know who they are, that kind of thing.

Akash Kazi (ex Signature OASIS)  24:39
Or I never stopped. I like, I never wrote this check number or this is not the right
dollar amount.

Ari Teman  24:45
Okay, yeah. Somebody put a one in front of the number and try to add $1,000 to the
amount, or something like that. Yeah, and then. But in the case of the fraud
department, they might also send that form too. In other words, if it's flagged for
fraud, they might say, hey. Ah, you it didn't, there's nothing that the oasis system
didn't flag it, but the fraud system flagged it. And you then fill out an affidavit,
and we'll reverse this check that kind of, okay,

Akash Kazi (ex Signature OASIS)  25:15
kind of, yeah,

Ari Teman  25:15
okay, but if, but all that has to happen with an RCC, you're saying in the first 24
hours,

Akash Kazi (ex Signature OASIS)  25:22
at most 24 hours, yeah,

Ari Teman  25:24
okay, because after that the check cleared, the transactions done.

Akash Kazi (ex Signature OASIS)  25:27
 Yeah.

Ari Teman  25:28
 Okay. So basically, if there's no automated fraud alert and there's no automated
Oasis alert in the first 24 hours of the of the transaction, then nobody in
Manhattan from Signature Bank was looking at that check. That check.

Akash Kazi (ex Signature OASIS)  25:44
No, no, basically not,

Ari Teman  25:45
 okay, so you literally need one of the automated systems to flag the check in the
first 24 hours in order for there to be a human being working for signature to
review the check before it clears.

Unknown Speaker  26:00
Yes.

Ari Teman  26:01
Okay. And then the only time a human from signature would go back and review that
check is if the client, let's say, a week later, goes, Hey, this money was taken out
of my account. What the heck happened? Okay, but that, but by the time that's
happened, the money has already gone into the vendor account, the payer account, the
pay,

Akash Kazi (ex Signature OASIS)  26:23
yeah, if you went through the clearing process, then, yeah, it's also, if it's like
a seven day clearing hold, right? Let's say it's, let's say it's an extended hold,
then, um, that transaction is still kind of pending for the seven days.

Ari Teman  26:41
 if it's hold by signature, if it's a hold by the client bank, the vendor bank,
that's only pre signature,

Speaker 1  26:51

[Page 52]

yeah,

Ari Teman  26:51
right, because let's say, let's say Bank of America says to the plumber, hey, this
is a lot of money. We're going to keep the money in bank of America for seven days
in case there's a complaint, but signature was done in the first 24 hours, even by
law, by regulation.

Akash Kazi (ex Signature OASIS)  27:09
Yeah, that can happen. That happens all the time,

Ari Teman  27:12
Right, So then if Bank of American comes to signature in day three and says, Is this
okay? It's already too late for signature, the money, by law, had to move out if you
didn't. In other words, if you didn't, if an automated system didn't flag it in the
first 24 hours, then the transaction clears, and no human being in New York City
touched it at all.

Akash Kazi (ex Signature OASIS)  27:32
Yeah, basically,

Ari Teman  27:34
okay, you do this all. It's actually impressive. 15,000 checks reviewed in a day by
eight people. You don't have, like, a support team in India or in New Jersey, or why
New Jersey?

Akash Kazi (ex Signature OASIS)  27:48
I think, I think, like, only the team is, like, even smaller now, but the workload
has definitely decreased from what I heard, yeah, but I think it's only like two or
three people now, and they're probably seeing only like two, 3000 checks per day.

Speaker 2  28:04
Probably a lot of people are afraid to put their money to signature at this point.

Speaker 1  28:09
Well, now it's now it's flagstar. But the thing I don't know what they really did,
but I think what they did is maybe the people that still banked with signature,
they're still getting the same service and all that white glove service, yeah, but I
think, like the original signature, uh, Signature Bank, like signature members are
the ones that these people are still reviewing transactions for. But I heard it's
only like two, 3000 but prior to that, I would like my team would each person would
review like, 5000 checks per day, 8000 per day.

Ari Teman  28:42
Yeah, you, you, it's interesting that you guys are still in touch. I guess if
there's eight people in a room for hours at the time you become friends, yeah,

Akash Kazi (ex Signature OASIS)  28:51
yeah. Actually, my uh old co worker invited me to her baby shower, but I wasn't able
to make it because I was doing a work event. But we still talk. We're all still

we're all still really cool.

Ari Teman  29:02
That's, that's good. And then, because we, I mean, one of the things that, again, comes up is this constant, like, so basically, put it this way, right? Let's say we were building a platform where, like, you could hire a plumber, like, like, I guess the comparison is, like, you're familiar with these sites where you could go on and hire a computer programmer or a graphic designer, and you put the money in escrow, right? So you say, Okay, I'm going to pay you $500 to $100 to design my website, and I'm going to pay you, you know, half up front and half when the job is done. So you give them the 250 and he makes your website. And then you say, No, this isn't what we agreed. It's, you know, you just stole something from another website or something, right? It's really, it's a bad job. It doesn't work. Doesn't work. Doesn't work on my mobile, whatever your claim is, right? So then you have a dispute process. So obviously, for us, the biggest concern is that this is an industry where there's a lot of bullshit from the payers, not from the workers. Meaning, a guy goes and he fixes the toilet,

Akash Kazi (ex Signature OASIS)  29:58
and they  find minor inconveniences, to not pay

Ari Teman  30:02
well, the landlords, yeah, the landlords love to set like, to stop checks. Do charge backs. It's like, seems to be, like a cultural thing. I could be wrong, but you were in the inside, but you weren't, oh, that would be more the fraud department. Or, you know, who's like, it must be that signature, because signature is still like a small world, right? Like it must be, they go, Okay, there's this landlord in Brooklyn. Let's say, right, Harlem, whatever Brooklyn, let's say we know that they just, they do charge backs all the time on vendors.

Ari Teman  30:32
Yeah

Ari Teman  30:33
, right. And this or signature would know. And then what's the position that they're just saying, like, Okay, this guy who owns, he has 60 buildings, and we're getting all their tenant money and everything and as deposits. So even though we know this, this landlord is stealing from their plumber and stealing from their, you know, bathroom repair guy. We're just gonna, we're just gonna approve the charge back and let the plumber fight about it in  court.

Akash Kazi (ex Signature OASIS)  31:08
Um, I'm not sure, but what happens, let's say, from my end at Teachers, is that, let's say you keep coming into, like, for example, I have a member that always comes in, like, you know, every couple of weeks, saying that, Oh, sorry. I was like, taking another story. But so she basically comes in, she has an issue with her husband. Her husband has dementia, and her son is stealing. And what happens is that every couple of weeks she comes in and she's but the thing is that the husband, the husband doesn't live here, he's in fought like, he's in, like, senior care in another state, yeah, and the son is in jail, and she's always coming in saying that,

Oh, I lost my debit card. Somebody stole, somebody stole money on my account. Eventually, there's a point that we have to be like, yeah, sorry. We can't open this dispute for you, right? Because you can't come in every week and tell me this every, like, every transaction this whole week happened as a fraud. You know what I mean,

Ari Teman  32:07
right? Right? Like, okay,

Akash Kazi (ex Signature OASIS)  32:08
our discretion to see if we can file this fraud or not. It's also up to our discussion if we can give you a new debit card or

Ari Teman  32:15
not. So in the case, for example. So that's important, even from, like, a legal perspective. I mean, you're not an attorney, right? But you're understanding, like at Signature Bank, if a landlord were to come, I'm using them as example, because they don't even exist anymore. But let's say that. Let's say that landlord number seven, we'll him call right? He comes into Signature Bank. Landlord seven is known to Signature Bank to be a real piece of shit. He steals from everybody. He doesn't pay. When he pays, he does charge backs. And they go, this guy does chargebacks all the time on ACH and RCC drafts. And we know, because we hear from the vendors, no, I did the work, right?

Ari Teman  32:53
You're saying technically signature has the ability to say, we're not actually going to process this chargeback. You have to go litigate. You have to go to court. Because even though you say you don't know these guys, we know that you have a pattern of lying.

Akash Kazi (ex Signature OASIS)  33:10
Yeah, or we would need, like, a written, like a written statement saying that, hey, I didn't do this. Because some of them, you can just come in and be like, Hey, I didn't do this. You click the buttons, start to dispute. But sometimes we need a handwritten letter or, like, proof that I wasn't there, you know, like, so

Ari Teman  33:27
it's not even right? So let's, let's talk about the example where, like, signature says to the to the landlord, you got to give us a handling letter and sign. You don't know this guy. You don't owe them any money, right?

Ari Teman  33:37
So technically, that guy sitting in Brooklyn, he's signing that letter. That's the thing that actually causes the chargeback. You wouldn't,

Ari Teman  33:46
In other words, there's no scenario where there's an RCC and Signature is making the decision on their own to do a chargeback whatsoever. In other words, the actual stop, the actual reversal of the transaction is occurring in Brooklyn, with the landlord signing that piece of paper, not in Manhattan.

Ari Teman  34:07
No,

Ari Teman  34:08
No Real decision is made in Manhattan, right? The decision is made by the landlord
in Brooklyn,

Akash Kazi (ex Signature OASIS)  34:14
With the banker, or by himself. Yeah.

Ari Teman  34:16
right, meaning they're going into a branch and they're signing this affidavit in
front of a banker, or they're signing it onand emailing it to the banker,

Speaker 1  34:23
Yeah

Ari Teman  34:23
but they're sitting when. that's a Brooklyn event. It's not a Manhatttan event,

Ari Teman  34:28
because basically you're saying Oasis, unless, unless there's a signature mismatch,
or, like, you can tell that, like, hey, they never send my we're just going to stop
this, because they, they they've never sent $100,000 to Topeka, Kansas, so we're
just going to block this without even making a call.

Ari Teman  34:45
Yeah,

Ari Teman  34:46
 but, but otherwise, you guys don't make decisions whatsoever. You you, you have to
call the client, and the client is the one that's that's basically stopping or
reversing the check and so that. So in this example. The decision impact is actually
in in Brooklyn and not in Manhattan.

Akash Kazi (ex Signature OASIS)  35:06
Yeah,

Ari Teman  35:06
 interesting. Okay, cool.

Ari Teman  35:09
I don't know how much time you I've got like, like, five minutes left.

Akash Kazi (ex Signature OASIS)  35:14
I have time, don't worry.

Ari Teman  35:15
 okay, good, good. I would say I'm very even the Zoom is going to shut me off in my
five minutes. But I'm very impressed by your knowledge. Like it's, I think from the

outside, people probably assume all these guys are just, like, checking a box, like on a web form, but you have to know a lot of regulations, and what will happen if you approve it or don't approve it, you know,

Ari Teman  35:38
yeah, what happens if you approve it and the money goes through. Bank of America, gets the money, vendor goes and spends the money. Three weeks later, the client says, No, I didn't approve that. So now you've got to go back to Bank of America and say it wasn't approved, assuming they signed a letter, right? But when that guy signs that letter, and he's signing it in Brooklyn, he's signing it at a branch in Brooklyn. That's not actually the Oasis team whatsoever. If a guy comes in -- that letter, anytime a client is signing a letter, that's the fraud department. That's not Oasis and that's happening at either in the client's email in their office, or it has to happen at the client's branch. So for a Brooklyn landlord, it's happening in a signature branch in Brooklyn, not in Manhattan. It's not the Oasis team. Oasis team is not involved. Interesting,

Akash Kazi (ex Signature OASIS)  36:25
no. But like, let's say some, let's say that scenario does happen, right? So let's say you write a check to me, and then later you go, Oh, I didn't write this check.

Akash Kazi (ex Signature OASIS)  36:35
 Then it would trigger it to come to Oasis team, because Oasis, let's say Oasis cleared it, right? Like our system automatically cleared it, or we reviewed it, and, well, most of the time if we reviewed it and cleared it, and now you say it's no good, then it comes back to us. Then we have a timeframe. I forgot exactly what that timeframe is. I feel like it's 30 days where we can still try to retrieve the money back. We would start a case with the feds, and then the the feds will try to retrieve the money back, and then we can, most of the time, get the money back,

Ari Teman  37:07
feds, meaning clearing house, not like the Southern District, not the federal prosecutors, like

Ari Teman  37:07
, no, no, no, like with the clearing house,

Ari Teman  37:09
just the federal clearing house. Okay, so, but, but then there would be a transaction, there would be there would be some message through the clearing house, and then the clearing house goes to Bank of America and says, These guys want the money back.

Speaker 1  37:26
Yeah, most of the time I believe it's Fiserv that handles that, so we will report it to Fiserv . And then Fiserv ,

Ari Teman  37:30
Fiserv is the federal system. And then, and then Fiserve gets a message from sounds like the VIagra guys,

Akash Kazi (ex Signature OASIS)  37:40
Ha ha

Ari Teman  37:40
but Fiserv gets puts the message over to Bank of America, and then Bank of America,
technically they could say, No, my customer has a contract, and

Akash Kazi (ex Signature OASIS)  37:50
Yeah,

Ari Teman  37:50
 are and so your customer has to do it.

Akash Kazi (ex Signature OASIS)  37:53
Yeah

Ari Teman  37:53
 There's for an RCC. After even a week, they're not required to send the money back
if there's any contract or relationship, if it's not pure like these guys, if these
guys knew each other and they had a business relationship, then they have to go to
litigation. Right now, did that happen where Bank of America or another bank would
say, No, our client has shown us that they have a legitimate transaction, so we're
not going to give the money back?

Akash Kazi (ex Signature OASIS)  38:16
Yeah, that happens most of the. That happens sometimes too. And then we would
basically, then it would turn into a dispute. Right. And then we would just try to
get the money back. But it depends on what proof that they submit and what proof we
submit, and we cross reference it, and then

Ari Teman  38:31
you're having a conversation with Bank of America, like you're emailing you and Bank
of America are emailing each other, or?

Akash Kazi (ex Signature OASIS)  38:40
I'm not sure that wouldn't fall under my department. Once we get, once that happens,
we give it to the fraud department.

Ari Teman  38:46
Okay, so then it's the it, meaning it's, it's not at all the Oasis department. If
it's a dispute about an RCC,

Akash Kazi (ex Signature OASIS)  38:51
yeah,

Ari Teman  38:52
it only, only an RCC where some random guy in India or Pakistan makes a fake RCC and
drafts it on an account, and it's so obvious that it's not that legitimate
relationship, not a disputed relationship, but the relationship that never existed.

That's oasis. But if the if it really was a vendor that was selling to this landlord, and the landlord turns around and says, I don't feel like paying this bill. I didn't authorize this particular payment, that's not an oasis issue at all. That's a fraud department issue

Akash Kazi (ex Signature OASIS)  39:22
Yeah.

Ari Teman  39:23
and and within the first 24 hours, if they didn't flag it, then the transaction cleared. And so no human being in New York, as we said, looked at it. Okay. Interesting. Interesting.

Akash Kazi (ex Signature OASIS)  39:35
Yeah,

Ari Teman  39:36
 all right. So when we get, when we get this, the platform more, flushed out. Maybe, maybe we'll chat again, because I kind of we would build like in reverse. We that's kind of the issue, right? In other words, the system only works if the vendors are getting paid in a timely fashion. It only works if you stop the fraud in a timely fashion, and it seems like you're. Really only have 24 hours to stop a fraudulent transaction, and after that, it's just automated. The computer moves the money. No human being ever touches it. So I gotta, I gotta run. I didn't think we'd go this long

Ari Teman  40:12
Yeah, no problem

Ari Teman  40:13
 but I appreciate it. All right, so maybe ping you in a couple days and we'll, we'll chat again.

Akash Kazi (ex Signature OASIS)  40:18
Okay, no problem. That's cool.

Ari Teman  40:19
happy charging.

Akash Kazi (ex Signature OASIS)  40:20
All right, take care. I'll see you soon. I'll talk to you soon. Bye, bye.

 Transcribed by https://otter.ai

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

**United States of America,**
Plaintiff,

v.

**Ari Teman,**
 Defendant/Movant.

Case No. 1:19-cr-696 (PAE)

---

# RULE 60(b) MOTION TO VACATE JUDGMENT, TRANSFER VENUE TO SDFL, AND REASSIGN TO A DIFFERENT JUDGE

Defendant/Movant Ari Teman, proceeding pro se, respectfully moves this Court pursuant to Federal Rule of Civil Procedure 60(b) to vacate the judgment in this matter, to hold that venue in the Southern District of New York ("SDNY") was improper, and to transfer this matter to the Southern District of Florida ("SDFL") for reassignment to a different judge.

---

# I. INTRODUCTION

This motion is timely and based on newly discovered evidence, fraud, and clear error of law. On August 20, 2025, former Signature Bank employee **Akash Kazi** disclosed to Movant on a recorded Zoom call (for which the recording was immediately disclosed by Zoom to Mr. Kazi) that the OASIS team at Signature Bank **makes no discretionary decisions on RCCs**; all such items are automatically flagged by software. All actual decisions were made by the **local Brooklyn branch handling Coney Realty's account**—but only **after** the RCC funds had already cleared into GateGuard's account.

This new evidence confirms:

- **No essential conduct occurred in SDNY.**

- Nor can venue lie in EDNY, because the RCCs cleared automatically before any review at all; responsive or reactionary acts after clearance cannot establish venue.

- Venue can lie **only in SDFL, where Mr. Teman physically presented the RCCs to Bank of America.**

Accordingly, the judgment must be vacated, the matter transferred to SDFL, and reassigned to a different judge to preserve both impartiality and the appearance of justice.

---

## II. LEGAL STANDARD

Rule 60(b) authorizes relief from a judgment for (1) mistake of law, (2) newly discovered evidence, (3) fraud or misconduct, or (6) any other reason that justifies relief. Fed. R. Civ. P. 60(b)(1), (2), (3), (6). A motion is timely where the movant acts diligently upon discovery of the new evidence.

---

## III. ARGUMENT

### A. Venue Cannot Lie in SDNY or EDNY

The government's own witnesses conceded:

- **Michael Haas and Coney Realty were located in Brooklyn (EDNY).**

- **Signature's OASIS image-recognition process is fully automated and no human made a discretionary decision *prior to the automated release of funds to GateGuard.***

- The RCC funds were ***already cleared*** before any review whatsoever by OASIS or the **Brooklyn branch.**

Therefore, any later acts by Signature or its employees were **responsive** rather than part of Teman's alleged conduct.

The Supreme Court and Second Circuit forbid anchoring venue on such responsive or collateral events:

- *United States v. Cabrales*, 524 U.S. 1, 6–7 (1998) (money laundering acts in Florida could not support venue in Missouri; essential conduct occurred only in Florida).

- *United States v. Rodriguez-Moreno*, 526 U.S. 275, 279 (1999) (venue tied to essential conduct elements, not where effects are felt).

- *United States v. Brennan*, 183 F.3d 139, 146 (2d Cir. 1999) (venue must be based on acts, not merely effects).

- *United States v. Ramirez*, 420 F.3d 134, 144 (2d Cir. 2005) (subsequent actions by others cannot establish venue).

Thus, even EDNY cannot be proper venue. By the time any human action occurred there, the alleged fraud was already consummated.

---

## B. Venue Lies Only in SDFL

The only place where the **essential conduct elements** occurred was the Southern District of Florida. There, Teman physically presented the RCCs to Bank of America for deposit. That act—presentation of the checks—is the *alleged* fraudulent conduct itself.

Every subsequent act was collateral or reactive:

- **Signature Bank's response** to Haas's perjured affidavit was a fraudulent reaction, not part of Teman's conduct.

- **Bank of America's honoring of the chargeback** (in Texas) was a discretionary failure of BofA, not Teman.

Because venue lies where the essential elements occur (*Cabrales, Rodriguez-Moreno*), and the only essential act was the deposit of the RCCs in Florida, venue lies solely in SDFL.

---

## C. Signature Bank's (Fraudulent) Acts in EDNY Cannot Create Venue

The government conceded Haas perjured in his affidavit to Signature. Signature itself knew this was false because it had prior checks from Haas to GateGuard. By honoring perjury it knew to be false, Signature committed fraud.

Teman could not reasonably foresee that a federally regulated bank would engage in deliberate fraud. The government's theory that "Signature review furthered the fraud" is nonsensical: had Signature simply done nothing, no chargeback would have issued and Bank of America would not have lost money.

---

**D. Relevant excerpts from the transcript showing all decisions by Signature are in EDNY, by the local Brooklyn branch (EXHIBIT C)**

Mr. Kazi's statements establish that venue cannot lie in the Southern District of New York because **all essential decisions regarding the RCCs were made exclusively at the client's Signature Bank's Brooklyn branch**, located in the Eastern District of New York. He confirmed that the OASIS team in Manhattan makes no discretionary determinations, that 100% of RCCs are automatically flagged by software, and that any review or decision occurs only at the local branch handling the account—in this case, Coney Realty's Brooklyn branch. Since the automated clearing of the RCCs was complete before any human involvement, and all subsequent discretionary actions took place solely in Brooklyn, no conduct element of the alleged offense occurred in SDNY.

As the Supreme Court made clear in *United States v. Cabrales*, 524 U.S. 1, 6–7 (1998), venue lies only where the "essential conduct elements" of the offense occurred, not where ancillary or reactive effects are felt. Here, the essential conduct was completed automatically, with human decision-making limited entirely to EDNY, foreclosing SDNY as a proper venue.

1. **Transaction posting *before* review**

   "The transaction already went through the clearing house, and then it posted, and then it's coming to us as the last step of verification."
   *(Ex. 3 at 5:18–5:23)*

2. **Oasis review is after the fact**

   "We didn't work live. We worked for the day prior."
   *(Ex. 3 at 4:45–4:47)*

3. *3.* **If Oasis flags, 100% of time client must be contacted**

   "Yeah."
   —in response to Ari Teman: *"...if Oasis flags it ... 100% of the time an Oasis team*

*will reach out to the client?"*
*(Ex. 3 at 15:14–15:16)*

### 4. Volume vs. staffing (few humans, mostly automated)

"It was like about eight or 10 people." (versus 15,000 checks reviewed daily)
*(Ex. 3 at 16:22–16:23)*

### 5. Chargeback decisions are made by clients in branches, not Oasis

"With the banker, or by himself. Yeah."
—in response to Ari Teman: *"...the actual reversal of the transaction is occurring in Brooklyn, with the landlord signing that piece of paper, not in Manhattan."*
*(Ex. 3 at 34:14–34:16)*

### 6. No decision made in Manhattan

"Yeah."
—in response to Ari Teman: *"...The decision impact is actually in Brooklyn and not in Manhattan."*
*(Ex. 3 at 35:06–35:06)*

### 7. Oasis not involved in disputes about RCCs

"Yeah."
—in response to Ari Teman: *"...if it's a dispute about an RCC ... that's not at all the Oasis department."*
*(Ex. 3 at 38:51–38:52)*

---

### E. Haas was a known fraudster and perjurer to Signature, and his perjury was obvious to Bank of America such that they could have simply denied the chargeback

It is a troubling reflection on the legitimacy of these proceedings that venue has been hinged entirely on the affidavit of Michael Haas — an affidavit which both the Government and Haas's own brother-in-law, Elie Gabay, have conceded was perjurious. In that affidavit, Haas swore under penalty of perjury to Signature Bank that he did not know

GateGuard. Yet, immediately beforehand, Haas emailed Gabay asking if the check was related to Teman, demonstrating his knowledge and willful falsehood. Haas subsequently fled to Israel upon being served by defense counsel, underscoring the seriousness of his misconduct.

The absurdity of relying on this perjured affidavit is compounded by the fact that no Signature Bank customer had sufficient funds, and Bank of America ultimately suffered no loss from any Signature transaction. Bank of America also had the ability to see that Haas/Coney was a client and deny the RCCs -- not only the ability but the obligation to do so under the law.

Venue properly lies in the Southern District of Florida, where Teman deposited the RCCs and engaged in an hour-long discussion with the branch manager and teller under multiple surveillance cameras — footage that Bank of America later deleted despite knowing it was evidence in a criminal investigation.

The bank also failed to produce dozens of relevant emails with and about GateGuard's corporate counsel who explained to them why the transactions were legitimate and should not be charged back, while simultaneously benefitting from Judge Engelmayer's undisclosed $2,000,000 equity stake in Bank of America.

Against this backdrop, Bank of America's boutique firm Morrison & Foerster immediately hired AUSA Edward Imperatore, the supervising attorney on this case, a brazen quid pro quo.

---

### E. Recusal Is Required to Preserve Fairness

Even if venue were debatable, reassignment is mandatory. Under 28 U.S.C. § 455(a), a judge must recuse when impartiality "might reasonably be questioned."

Here, Judge Engelmayer's conduct mandates recusal:

1. **Coaching the Government:** Transcript shows Engelmayer suggested the very venue theory the prosecution adopted.

2. **Ex Parte Call:** Engelmayer admitted to an ex parte call with the Head of the General Crimes Division.

3. **Impeachment:** Judge Engelmayer currently faces two counts of impeachment.

4. **Personal Conflicts:** Engelmayer is a defendant in a case with his mentee Noam Biale, who is accused of concealing his marriage to AUSA Margaret Graham while misleading defendants.

5. **Financial Conflicts.** Judge Engelmayer also failed to disclose that he holds approximately $2,000,000 in Bank of America stock while presiding over a case in which Bank of America's conduct was central. At trial, he barred Defendant from calling an expert who would have testified that Bank of America, not Mr. Teman, bore responsibility for the losses at issue. A

n investment of that magnitude creates an obvious financial interest in the success and legal protection of Bank of America.

The conflict is magnified because, upon prevailing in this matter, Mr. Teman and GateGuard would have grounds to pursue claims against Bank of America for **hundreds of millions of dollars in damages, as well as declaratory and regulatory relief based on the bank's admission under oath that it processes RCC chargebacks without proper investigation.** Such claims could also **prompt class action litigation,** exposing Bank of America **to billions of dollars in liability**.

Any such outcome **would directly reduce the value of Judge Engelmayer's holdings by tens or even hundreds of thousands of dollars.**

The Second Circuit's Summary Order, which both Grok and ChatGPT say was written by Engelmayer himself (or the same clerk who wrote his District Court decisions) (Dkt. 509-1, 509-2) conspicuously ignored these litigation and regulatory implications. No surprise given Engelmayer's brazen habit of coordinating with judges and prosecutors ex parte to aid the prosecution.

Under 28 U.S.C. § 455(b)(4), recusal is mandatory where a judge has a financial interest in a party to the proceeding, however small. Here, the risk is not merely speculative but substantial, making recusal not only warranted but required.

6. **Improper Influence on Appeal:** Multiple independent AI analyses (now before the Second Circuit) concluded Engelmayer authored the Second Circuit summary order. (Dkt. 509-1, 509-2)

If Judge Engelmayer were not so personally and corruptly invested in shielding his mentee, Noam Biale, he would have no reason to resist transfer to the Southern District of Florida and could rest confident that a conviction would be secured there if the government's case had merit. Instead, Judge Engelmayer knows that Mr. Teman is innocent and that this case originated as a cover-up for **AUSA Guttwillig's** mistaken arrest of Mr. Teman for ***forging his own signature.*** Guttwillig could not have arrested Teman over a contract "Structure" or content issue, because Guttwillig had never accessed the contract until 5 months after the arrest warrant. As with the Jeffrey Epstein case, Engelmayer has buried the Grand Jury transcript which would prove 100% this was a constructive amendment.[1]

To preserve that mistake, Judge Engelmayer has issued rulings with no basis in fact or law and has facilitated their affirmance in the Second Circuit by drafting orders that were later rubber-stamped by clerks.

It has become evident that cases in the Second Circuit are not randomly assigned (the odds of Englemayer randomly being assigned all the Jeffery Epstein-related cases he's taken is *less than* 1-in-3 trillion), that prosecutions are politically coordinated through ex parte communications, and that undisclosed personal relationships between prosecutors and defense counsel further undermine fairness. This case lacks any legitimate legal or factual foundation. Nevertheless, Movant places this motion on the record in the hope that the federal judiciary will soon return to a system that reflects the rule of law and impartial adjudication, rather than one compromised by political influence and undisclosed conflicts.

The appearance of impartiality is destroyed. Under *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 860–61 (1988), reassignment is required.

---

## IV. CONCLUSION

For the foregoing reasons, Defendant respectfully requests that the Court:

1. Vacate the judgment under Rule 60(b);

2. Hold venue in both SDNY and EDNY improper;

3. Transfer this matter to the Southern District of Florida, the only proper venue; and

---

[1] AG Pam Bondi and US Attorney Jay Clayton, who has been served a copy of this motion, can admit that this was a mistaken arrest for forgery and not a contract dispute case regardless of Engelmayer's misrepresentations about Grand Jury transcripts. It would show the public that Engelmayer and the DOJ are not simply one beast but are actually independent actors.

4. Order reassignment to a different judge upon transfer.

Respectfully submitted,

Dated: August 21, 2025 (27th of Av, 5785)

/s/ Ari Teman
 Ari Teman, Pro Se
Tel Aviv, Israel

# DECLARATION OF ARI TEMAN IN SUPPORT OF RULE 60(b) MOTION

I, Ari Teman, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury as follows:

1. I am the Defendant/Movant in this case. I make this declaration in support of my Rule 60(b) motion to vacate the judgment, transfer venue to the Southern District of Florida, and reassign the matter to a different judge.

2. On August 20, 2025, I participated in a recorded Zoom call with Akash Kazi, a former Signature Bank employee who worked with the OASIS team.

3. During that call, Mr. Kazi confirmed unequivocally that the OASIS team at Signature Bank does not make any discretionary decisions on RCCs. Instead, he explained:

   ○ RCCs clear before the OASIS team reviews them

   ○ The OASIS software automatically flags 100% of RCCs.

   ○ OASIS staff *always* defer to the local branch (in this case, EDNY) to decide whether to release or block funds. OASIS makes *no* decisions regarding funds.

   ○ Any actual decision regarding a flagged RCC rests solely with the local branch handling the account, in this case Signature's Brooklyn branch servicing Coney Realty, both in EDNY.

4. Mr. Kazi's statements confirm that no Signature employee made a discretionary decision prior to the automated release of the RCC funds to GateGuard. Thus, the alleged fraud was complete at the moment the RCCs cleared into GateGuard's account.

5. Mr. Kazi further confirmed that all later actions by Signature—including its handling of Michael Haas's affidavit—were reactive and not part of the clearing of the RCCs.

6. A true and correct copy of the recording of the Zoom call and a transcript prepared from it are attached as Exhibit A and B (audio and video) and Exhibit C, respectively. (Audio and video recordings are hosted on Dropbox at : https://www.dropbox.com/scl/fo/f6fngp7mi5gdhyhkz5mcz/AER4V_TmskfCUpAPbg24u UI?rlkey=1ith932o2sbtt6v8sp9d683va&st=w5n7e8ho&dl=0 , and were provided via

email to the Clerk to provide as Exhibit A and B.)

7. I did not learn this information until August 20, 2025.

8. This new evidence was previously unavailable despite due diligence as Signature staff were unresponsive despite repeated requests. Signature Bank has recently been shut down, and ex employees are more likely to feel free to speak without retribution as a result of Signature no longer existing.

9. This evidence demonstrates that venue cannot lie in the Southern District of New York, or even in the Eastern District of New York, because the essential conduct elements were completed before any branch review, and the only relevant acts occurred in the Southern District of Florida, where the RCCs were physically presented.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 21, 2025.

/s/ Ari Teman
 Ari Teman, Pro Se

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

**United States of America,**
Plaintiff,

v.

**Ari Teman,**
 Defendant/Movant.

Case No. 1:19-cr-696 (PAE)

## [PROPOSED] ORDER

Upon consideration of Defendant/Movant Ari Teman's Rule 60(b) motion, it is hereby:

**ORDERED** that the judgment previously entered in this matter is VACATED for lack of venue and newly discovered evidence; and it is further

**ORDERED** that venue in both the Southern District of New York and the Eastern District of New York is improper; and it is further

**ORDERED** that this action is hereby TRANSFERRED to the United States District Court for the Southern District of Florida, as the only proper venue under 18 U.S.C. § 3237; and it is further

**ORDERED** that upon transfer, this matter shall be assigned to a judge other than Hon. Paul A. Engelmayer, pursuant to 28 U.S.C. § 455, to preserve both impartiality and the appearance of impartiality; and it is further

**ORDERED** that the Clerk of Court is directed to take all steps necessary to effectuate this transfer.

SO ORDERED.

Dated: August ___, 2025
 New York, New York

# EXHIBIT C

Shelly Jenkins Pecot
18 Mercer St. New York NY 10013
shelly.pecot@gmail.com (917) 561-6505

Judge Paul Engelmayer
District Judge
Southern District of New York
40 Foley Square
New York, NY 10008

August 21, 2021

Your Honor,

My name is Shelly Jenkins Pecot. I am a shareholder at 18 Mercer. I was out of the country when I was subpoenaed to testify.

With regard to 18 Mercer, I do not believe Ari Teman should go to prison.

Ari Teman did warn myself and other shareholders of what he said were the following terms in the contract he signed with our then board Vice President via an online document.

1. There was an $18,000 fee for removing the device
2. There was a $10,000 fee for collections
3. There would be attorney fees
4. There was binding arbitration
5. That he believed he had the right to draft owed monies from our bank account

I confirm that I did text with Mr. Teman and that the texts he has shown to me are accurate and match those on my phone.

I also confirm that I did forward the two attached emails to Mr. Teman on Aug 19th.

I do not live in New York and was only at the coop for a few days while Mr. Teman's device was installed. During that time, the device was connecting to the app but seemed to be disconnected from the door lock.

My personal interactions with Mr. Teman on this matter were amicable at first. I believed that he wanted to work with us to get his device working properly. Mr. Teman told me that our internet was not sufficient to run the device and that he had informed the board of this. Mr. Teman also told me that he had added a new router to help with this issue.

I was informed by another shareholder that this shareholder had been told by contractors that Bonnie Soon-Osberger had instructed them to disconnect the device. At the time, my suspicion was that it had been sabotaged to justify going with a different company. However, I had no direct proof of this and now believe they were referring to when the device was removed to be replaced.

I have no direct knowledge of Mr. Teman's interactions with the board or management. However the management team did insist to shareholders that they had no interactions with Mr. Teman. Mr. Teman forwarded me emails between himself and management to show me that they were not being truthful.

[Page 73]

I am out of state, but I would be happy to speak by Zoom on this matter if you have any further questions.

Shelly Jenkins Pecot

Aug 20, 2021

Shelly Precot appeared before me on August 20th 2021

Melody Hannigan as notary

MELODY HANNIGAN
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID# 20064012643
MY COMMISSION EXPIRES APR. 05, 2022

Ari Teman

The Honorable Paul A. Engelmayer
District Judge
Southern District of New York

December 21, 2021

RE:   **Motion for Sanctions against the Government for obstruction of justice:**
      **The Government KNEW Soleimani and Soon-Osberger/Hom were violating their subpoenas and hid it.**

The Defense issued a subpoena to Government witness Joseph Soleimani of ABJ Properties on December 23, 2019. It covered documents and discussions related to GateGuard and its employees and officers, which includes Teman. Soleimani replied with documents on January 15, 2020 at 5:43:14 PM EST.

Later on, after trial, in civil discovery in two cases we were presented with conversations and documents Soleimani had about Teman with MVI (defendants in *GateGuard, Inc. v. MVI Systems LLC (1:19-cv-02472)*) and Goldmont (defendants in *GateGuard, Inc. v. Goldmont Realty Corp.* (1:20-cv-01609)). Soleimani had not produced these responsive documents. There is no excuse for Soleimani not to produce these documents.

These previously-withheld documents, ***which the Government knew existed and acted to hide,*** make clear that:

(1) Soleimani knew that his internet connection was to blame for GateGuard having been offline (EXHIBITS J, N), because that same internet connection was causing issues with the replacement company's system *which he discussed in a group chat where he also discussed Teman, US v Teman, and GateGuard* meaning he was required to hand it to the Defense (EXHIBIT N). Soleimani and AUSA Bhatia knowingly lied to the jury multiple times telling them GateGuard did not work when it was Soleimani's internet connection which was faulty.

(2) Soleimani had a history of not paying intercom vendors, using the same excuses he used to avoid paying Teman's company, GateGuard, and in-fact was in debt to the replacement company by over $13,000 (EXHIBIT J) and had refused to pay for more than a year,

(3) Soleimani made proactive efforts to hide that he was knowingly breaching his exclusive agreement with GateGuard, meaning Soleimani was well-aware of the Terms and Conditions of GateGuard. Soleimani perjured on the stand in *US v Teman* regarding his knowledge of the GateGuard Terms.

(4) Soleimani discussed the arrest of Teman and *US v Teman* with defendants in multiple federal civil trials *which had been filed based on GateGuard's Terms and Conditions* (EXHIBITS B, F),

(5) Soleimani and his co-conspirators not only hid these communications and documents, but also made a proactive effort to avoid a paper-trail at times when discussing Teman, moving from WhatsApp chat to phone (EXHIBIT B),

(6) Soleimani aided MVI, defendants in a trade secret theft suit filed by GateGuard (Teman) in gaining-access to and stealing proprietary information from GateGuard devices  in exchange for discounts and revenue-sharing ,

(7) Soleimani had a revenue sharing agreement with MVI and was listed as a Certified Distributor in violation of his exclusive agreement with GateGuard, and Soleimani knew this, and even asked MVI to hide his and their logos, but still made sure to get credit for business referrals to MVI -- that is, Soleimani was acting as a *direct competitor to GateGuard* together with MVI,

(8) Soleimani reviewed terms and contract length in detail before ordering an intercom (EXHIBIT H, "- It doesn't say anything about minimum terms, are there any? - what happens when they sell the property? These are q's Joe has."), and then failed to honor these written terms!

(9) Soleimani was willing to sign a contract for *twice the amount* per year for the knock-off service (MVI was $1300/year/building), and $3000+ for each device upfront. GateGuard's low monthly fee was because the cost was spread over 10-30 years, not because it was a cheap device! (Smart intercoms are low-volume, high-quality items which cost a lot to design, manufacture and support.)

All of these, and other issues in the documents Soleimani hid would open him to cross examination, show he had a multi-million dollar incentive to have Teman falsely imprisoned, show he had a pattern of failing to pay vendors using the same excuses, show he *and AUSA Bhatia* falsely accused GateGuard of "not working" when he knew the cause was his internet connections and that he had far more issues with the replacement system. The jury would have seen Soleimani is a regular deadbeat who stiffed his intercom vendors and did not honor his agreements.

One of Soleimani's co-conspirators, Leon Goldenberg (Goldmont Properties) admitted in a sworn deposition that he'd hoped the criminal case would cause Teman to be unable to sustain a lawsuit filed against him! (EXHIBIT C)

### **Most critically, the Government KNEW Soleimani was violating his subpoena and hid it**

The Government knew Soleimani was in communication with MVI and Goldmont. The Government knew these communications existed *because* of the suicide note Your Honor addressed before trial.The Government withheld the paper trail of the suicide note. They knew Soleimani gave them the note, and that he got it from Taub and Goldenberg, as the attached WhatsApp chats between Soleimani and Taub (EXHIBIT B) and Goldenberg and Litchfield (EXHIBIT A) show.  The Prosecution should have produced the paper trail before trial and informed the Defense that Soleimani provided the note and that he got it from Taub and Goldenberg.

The Government knew that Soleimani was conspiring and colluding with two entities that GateGuard had sued over its online terms (the same online terms in question in *US v Teman*) and hid this. The Government hid at least one interview with Abi Goldenberg (Goldmont officer) and with Attorney Simcha Schonfeld, joint attorney for Goldenberg, Taub, and Soleimani. We also know from the Soleimani-Taub WhatsApp chat that Soleimani hid at least one discussion (with a defendant in a Federal civil trial filed by GateGuard!) of a NY State lawsuit where GateGuard was seeking to enforce its online terms.  We learned of these hidden interviews and missing 3500 notes after trial. Therefore the Government was hiding documents on its own, and not speaking up when it became aware that Soleimani was non-responsive to his subpoena.

The Government knew that the Goldenbergs were hoping to aid in putting Teman into prison to avoid paying a contract they signed worth nearly $100,000 more than the alleged damages in *US v Teman*, and that GateGuard's bank account was to be in the black long before trial -- had Goldenberg not breached their agreement. (EXHIBIT C). The Jury would have heard of a case with no damage to any bank.

**The Government also hid that Soon-Osberger and Hom were non-responsive to their subpoenas**

The Government did not disclose when it became aware that Soon-Osberger and Hom were non-responsive to their subpoenas, issued to them at the same time as Soleimani's by the Defense.

The Government had the ability and responsibility to know the role of their witnesses in the organizations they testified (falsely) to representing, including: (a) Soon-Osberger and Hom were no longer officers of 18 Mercer Equities, (b) they were terminated under allegations of fraud and of "sabotaging" the GateGuard device to avoid the bill (DOC 284, as provided by Shelly Jenkins Pecot to Your Honor), and (c) Signature Bank (which testified for the Government against Teman) also knew and hid that Soon-Osberger and Hom had been terminated and replaced (the signature card for the new board member(s) and management company were hidden from the defense), and thus that (d) Signature Bank also failed to properly respond to their subpoena and obstructed justice.

Had the Government not hidden that Soon-Osberger and Hom were terminated, the Defense could have cross-examined them on their alleged "sabotage" of the device, and subpoenaed the other shareholders, board members, and parties mentioned in the emails Soon-Osberger and Hom wilfully hid from evidence, despite them being covered by their subpoenas (which required they produce all documents relating to GateGuard and its employees and officers). These other parties would have provided these emails, showing Soon Osberger and Hom to be obstructing justice before trial.

Had Soon-Osberger and Hom been responsive to their subpoenas and included the emails (EXHIBITS D and E) the Defense could have shown that **Teman did explicitly warn the clients of the specific fees *before the clients incurred the fees and long before they were drafted*** (EXHIBIT E), and that **the clients *discussed the Payment Terms and fees with each other in writing*** and wrote they believed they were **"legally liable" for the fees** (EXHIBIT D). *The fundamental accusation of this case, that Teman hid the terms and didn't communicate them before drafting the fees, is false as shown in the written communications that Hom and Soon-Osberger and Soleimani hid!* As Shelly Pecot makes clear in her sworn statement to Your Honor, 18 Mercer was clearly warned by Teman and was aware that the contract allowed GateGuard to draft the fees from the accounts (RCCs). As Teman clearly communicated to his client his understanding at that time that the contract allowed the RCC's, providing critical evidence that there could not have been any mens rea.

The Defense could have also cross-examined Signature Bank as to why they were processing the chargeback request affidavit of Hom when she was not a lawful representative of 18 Mercer Equities and had been fired. This would have shown the incompetence or negligence of Signature Bank and put the responsibility for the damage against Bank of America onto the lies of the clients and the incompetence or negligence (or worse) of their banks. In fact, the Defense could have presented expert testimony that Signature Bank was required to reverse the chargebacks (as is Soleimani's bank required to reverse the chargebacks, given his fraud), leaving Bank of America without any damage.

**Summary**

The Government and its witnesses actively hid an abundance of exculpatory and impeachment evidence, including evidence Teman warned the clients very clearly in advance of the fees being drafted, and that the clients believed themselves to be "legally liable" for the fees.

It's also clear from the hidden evidence that GateGuard's online terms were discussed frequently and extensively by Soleimani, Soon-Osberger, Hom, with members of their organization and others. Contrary to

their testimony, and the false image presented by the Government, these terms were not hidden, but were discussed openly by Teman with the clients and then by clients with multiple parties *in emails and messages they intentionally hid from the defense*!!!

*The fundamental accusation of the case is completely false! Teman was upfront with the clients about the terms and fees, and the clients admitted to themselves they were "legally liable" (Mercer) and Soleimani asked for and was denied "a release" from GateGuard's counsel. Teman had just as much right to believe he was allowed to draft these fees!*

Bank of America's shortage was avoidable several ways -- learned of after the trial and unrelated to Teman's RCC's, including proper chargeback handling by Signature, proving to Chase a pattern of fraudulent non-payment by Soleimani to intercom providers, and proper communication and procedures by the banks.

The Jury would have seen Teman had no mens rea to defraud his bank or his clients. The Jury would have seen that Soleimani, Soon-Osberger, and Hom were perjurers and fraudsters who intentionally hid evidence. They would have found *at least* reasonable doubt and Teman would have been acquitted.

A Defendant is entitled to a fair trial, which includes all responsive documents subject to subpoena. It certainly includes a trial where the *Government itself is not obstructing justice,* hiding evidence and interviews, as Mr. Bhatia and Mr. Gutwillig and their team clearly did.

Their behavior screams for an independent investigation of the full file in this case by a US Attorney's office outside SDNY, as does their hiding for half a year that AUSA Graham was able to eavesdrop on every attorney-client conversation of Mr. Teman's counsel *who had been hired to expose SDNY's disclosure violations and instead colluded with SDNY on a major one!*

Defendant therefore respectfully motions that Soleimani, Soon-Osberger, Hom, and the Government, including Mr. Bhatia, Mr. Gutwillig, Mr. Allesandrino, and Mr. Imperatore be sanctioned and ordered to pay all of Mr. Teman's legal fees and expenses related to this case, current and ongoing.

Defendant therefore also motions for the Government to be ordered to provide to the Defendant the full file(s) on Mr. Teman, *US v Teman,* and any and all internal communications, emails, chats, text messages, and the like. Because one of the AUSA's involved in willful disclosure violations against Mr. Teman is AUSA Graham, a close personal friend of Your Honor, Defendant respectfully requests and motions for the aforementioned motions and this matter to be heard before an independent Court who is not close personal friends with AUSA Graham or her husband.

Thank you,

Ari Teman, defendant Pro Se

**EXHIBIT A**

Goldenberg to Litchfield Whatsapp Chat

```
12/11/19, 7:15 PM - Yanky Litchfield: <Media omitted>
Teman Suicide Note
12/11/19, 7:21 PM - Abi Goldenberg: I sent this out today he sent it to me! I sent
it to taub
12/11/19, 7:22 PM - Yanky Litchfield: I guess this is going around
12/11/19, 7:24 PM - Abi Goldenberg: Where did you get this from?
12/11/19, 7:25 PM - Yanky Litchfield: My distributor
12/11/19, 7:26 PM - Abi Goldenberg: So is it confirmed?  Is it bd'e?
12/11/19, 7:26 PM - Yanky Litchfield: I have no idea
```

("bd'e" = Baruch Dayan HaEmet, Blessed is the True Judge, a phrase said upon someone's death.)

EXHIBIT B

Soleimani and Taub Whatsapp Chat

---

000277-278

[12/11/19, 1:07:54 PM] Samuel T: **Teman Suicide Note.pdf** • 3 pages

<attached: 00000095-Teman Suicide Note.pdf>

[12/11/19, 1:09:17 PM] Joe Solemani: **What is that??**

[12/11/19, 1:11:06 PM] Samuel T: **Just got this from another management company being sued by Teman. Teman sent it to him. Read it. You and I are personally mentioned.**

[12/11/19, 1:11:36 PM] Samuel T: **I wonder what his game is now, or if he will actually do it.**

[12/11/19, 1:30:05 PM] Joe Solemani: **Thanks for sending**

[12/11/19, 2:05:10 PM] Samuel T:

https://lawandcrime.com/opinion/bizarre-no-stevie-nicks-contract-clause-takes-center-stage-in-nyc-legal-dispute/

[12/11/19, 2:23:32 PM] Samuel T: <attached: 00000101-**Abi Goldenberg.vcf**>

[...]

[12/12/19, 10:34:52 AM] Samuel T: **Hi Joe. Please give me a call as soon as you can.**

**About Teman. Just need to be sure of something.**

[12/12/19, 10:35:05 AM] Samuel T: 30 seconds call

---

EXHIBIT C
Leon Goldenberg Deposition

Page 376

```
 1              GOLDENBERG
 2  that as part of the strategy here when you were
 3  discussing with Abi how to -- how to handle this
 4  case whether, you know --
 5      A.   No.  I was hoping that that would
 6  impact him.
 7      Q.   How do you mean?
 8      A.   You know, if he's going to jail,
 9  going to be in jail, can't work, will it get him
10  to drop the lawsuit.  Obviously it didn't.
11      Q.   Okay.  So your -- fair to say your
12  hope was that if Mr. Teman went to prison, that
13  would potentially resolve the -- this problem for
14  you?
15      A.   Yes.
```

EXHIBIT D

Board member of 18 Mercer, Margaret Crimmins, tells Soon-Osberger she is "legally liable" for the fees outlined in the GateGuard contract:

From: **Margaret** <margaret@dogbarksound.com>
Date: Mon, Oct 22, 2018 at 11:40 AM
Subject: Re: Who moved the intercom at 18 Mercer?
To: Bonnie Soon-Osberger <bsoon-osberger@metisource.com>
Cc: Stephanie Phillip <shp83@hotmail.com>, bonnie soonosberger <bsoonosberger@gmail.com>, Mark Osberger <mark.axisfilms@gmail.com>. Angela Huang <ahuang30@gmail.com>, <traceytooker@hotmail.com>, <rwien@cbs.com>, Roberta Buldini <robi.buldini@gmail.com>, Cc: Jackie Monzon <jackie@crystalrmi.com>, Archie Davidson <inchfitness@aol.com>, <shelly.pecot@gmail.com>

We know who moved it. You told the men working on the lobby to move it. ( they told me) So I guess you're legally liable.

Sent from my iPhone

EXHIBIT E

Board member of 18 Mercer, Margaret Crimmins, outlines to all 18 Mercer Shareholders *and Gina Hom* (who also failed to produce this document in violation of her subpoena) the dates, amounts, and specific fees Teman warned the shareholders they would incur *if* they breached the agreement. There was *nothing* hidden or buried!

---

From: margaret <margaret@dogbarksound.com>
Date: Mon, Dec 3, 2018 at 11:44 AM
Subject: Re: How do we resolve this intercom situation?
To: Jackie Monzon <jackie@crystalrmi.com>
Cc: Tracey Tooker <traceytooker@icloud.com>, Bonnie Soon-Osberger <bsoon-osberger@metisource.com>, shp83@hotmail.com <shp83@hotmail.com>, Shelley Pecot <shelly.pecot@gmail.com>, dick <rwien@cbs.com>, robi.buldini@gmail.com <robi.buldini@gmail.com>, Caroline Cabrera <caroline@crystalrmi.com>, Gina Hom <Gina@crystalrmi.com>

By 'the board' so you mean Bonnie and Stephanie? I'm a board member and I have no idea where things stand with the intercom.

**The last communications from Ari Teman:**

10/5  An e-mail from Ari stated that there was a 10 year contract and he would put a lien on the building.

10/22  The next e-mail from Ari stating that it would cost $18,000 to disable the device and $10,000 in collections if he wasn't paid in full.

**The last communication from Bonnie.**

10/22  An e-mail to Ari stating that he would hear from our attorney that week

And that's the only information the shareholders have. Are we involved in a lawsuit? Are we working on getting another intercom? Is there some reason the shareholders can't have this information?

Thank you,

Margaret

On Dec 3, 2018, at 10:16 AM, Jackie Monzon wrote:

> The Board is working on this.
>
> Jackie Monzon
> President
> 1441 Broadway, Suite 5047
> New York, NY 10018
> 646 569-5574

---

EXHIBIT F

Abi Goldenberg admits he spoke with the Government and Soleimani about Teman and GateGuard.

---

3.   Identify each Person with whom You communicated concerning GateGuard.

**Response:** The Defendant objects to this Interrogatory as vague, ambiguous, overbroad and unduly burdensome. Without waiving the above objections, Defendant responds that he communicated with Leon Goldenberg, Samuel Taub, Rabbi Howard Jachter, attorney Jacob Rubinstein, attorney Ariel Reinitz, Ari Goldberg, Levi Herman, Joseph Soleimani and Daniel Alessandrino concerning GateGuard.

4.   Identify each Person with whom You communicated concerning Ari Teman.

**Response:** The Defendant objects to this Interrogatory as vague, ambiguous, overbroad and unduly burdensome. Without waiving the above objections, Defendant communicated with Leon Goldenberg, Samuel Taub, Rabbi Howard Jachter, attorney Jacob Rubinstein, attorney Ariel Reinitz, Ari Goldberg, Joseph Soleimani and Daniel Alessandrino concerning Teman.

3

---

[5/18/18, 4:16:17 PM] Ben Kozuch: Who wouldn't!!!

[5/18/18, 4:16:32 PM] Samuel T: One other fun piece of information, one of the buildings we are going into next week, **currently has another intercom system there,**

**that we all know well.** Can anyone guess what system is being replaced with a

KeyCom??...

[5/18/18, 4:17:24 PM] Mahesh Sirisena: 😁

[5/18/18, 4:17:55 PM] Mahesh Sirisena: Does anyone use resident portal? Anyone has

that info?

[5/18/18, 4:18:46 PM] Samuel T:

image omitted

[5/18/18, 4:19:09 PM] Samuel T: Sure. Plenty.

[5/18/18, 4:19:19 PM] Melissa Lachman: HA!!!!!!!!!!!

[5/18/18, 4:19:32 PM] Melissa Lachman: we are replacing Teman, that makes me extra happy

[5/18/18, 4:20:53 PM] Ben Kozuch: Seriously ?

[5/18/18, 4:21:01 PM] Ben Kozuch: He actually has a product

[5/18/18, 4:21:24 PM] Ben Kozuch: I thought he just eats popcorn all day

[5/18/18, 4:21:38 PM] Melissa Lachman: he just writes his name on other people's products 😜

[5/18/18, 4:22:45 PM] Avraham Seff: ↵

[5/18/18, 4:26:11 PM] Shragie David Aranoff: Big news. We are off to the races folks!

[5/18/18, 4:43:40 PM] Eli Ehrenfeld: Amazing. Have a great yom tov!

[5/21/18, 1:32:40 PM] Simcha Milworm: WOW NOW THATS WHAT I LIKE HEARING!!! we'll the good news is that I'll be back on track Tuesday morning

[...]

[5/22/18, 10:35:32 PM] Samuel T:

image omitted

[5/22/18, 10:36:00 PM] Samuel T: Google maps photo of 539 Lennox.

[5/22/18, 10:36:09 PM] Ben Kozuch: abj?

[5/22/18, 10:36:17 PM] Ben Kozuch: its an outdoor job?

[5/22/18, 10:36:18 PM] Ben Kozuch: oy

[5/22/18, 10:36:18 PM] Samuel T: Check out the intercom at the front door

[5/22/18, 10:36:34 PM] Samuel T: It's Teman!

[5/22/18, 10:36:35 PM] Ben Kozuch: hopefully theres no sun there

[5/22/18, 10:37:05 PM] Samuel T: True

[5/22/18, 10:38:09 PM] Samuel T: We will be testing the new outdoor screen

tomorrow. It's supposed to be very sunny and 80 degrees. Hopefully this
screen will

be good

[5/22/18, 10:38:33 PM] Ben Kozuch: Ha! should we get our own surveillance
there

just in case he tries to vandalize

[…]

[5/24/18, 11:53:51 AM] Simcha Milworm:

image omitted

[5/24/18, 11:53:51 AM] Simcha Milworm:

image omitted

[5/24/18, 11:54:20 AM] Simcha Milworm: U can all say ur final good bye now

[5/24/18, 11:57:34 AM] Ben Kozuch: Ha!

**EXHIBIT H : Soleimani reviews terms before ordering an intercom**

image omitted

[5/30/18, 7:24:59 PM] Shragie David Aranoff: Sruli, Draft for ABJ... If this works,

we'd use this for quoting each job and have a 1-page contract cover on top

[5/30/18, 7:26:54 PM] Sruli Gold HSI: That's fine by me.

It doesn't say anything about minimum terms, are there any?

- what happens when they sell the property?

These are q's Joe has.

[5/30/18, 7:28:21 PM] Shragie David Aranoff: Heading out now. Min term should read

1 yr.  On the cover terms, would address sale and allow to be transferrable to

buyer

**EXHIBIT I : Soleimani discusses Terms more:**

[6/1/18, 1:54:09 PM] Shragie David Aranoff: Also, Sruli, I spoke with Joe ABJ this

am re terms. Answered some questions. Heads up he is going to call you about the

next project(s) - he wants to discuss the 3 keycoms on 2 buildings ... my sense is

he is looking for a steep discount on the extra KeyCom...

**EXHIBIT J : Soleimani owes $13,000 for over a year, also has issues with other intercom**

[3/12/19, 3:10:24 PM] Samuel T: **Hi Joe, we would really appreciate if we can get some payment towards your software? I know that we still haven't given you the newest product, and the hardware isn't perfectly stable on the outdoors, but we have been servicing it regularly, and it has been working 95% of the time, and 100% on most of the buildings. According to our records you currently owe us $13k. Can you at least send us out some of that?**

[3/12/19, 3:11:54 PM] Samuel T:


<attached: 00000032-PHOTO-2019-03-12-15-11-54.jpg>

[3/12/19, 3:13:36 PM] Joe Solemani: Yes sure ill send some out. When can we expect

everything to be 100%? and the new systems to be installed?

[3/12/19, 4:16:27 PM] Samuel T: Unfortunately the ones that aren't 100% uptime, simply has to do with weather and internet related issues. Those units are just not 100% weatherproof unfortunately. All the software problems have been completely worked out many months ago, so that isn't the cause anymore. The only thing that will give it certain 100% uptime outdoors, is our new units that are carefully protected on every component. The BOLT has been available for 2 months already, and is selling very well, but the LITE is unfortunately in its 3rd revision now. The samples kept coming in from the factory with issues, so until it's perfect, we unfortunately can't make an order. The last thing I would want is more recalls. We are expecting the 3rd revision within a week or so, and if it's perfect we will place the first major order. As of right now, it's looking like the end of April unfortunately, but even that I cannot guarantee.

[3/13/19, 1:40:25 PM] Joe Solemani: can yoou email the invoices?

[3/13/19, 2:18:58 PM] Samuel T: Sure. Will have it sent out shortly.

**EXHIBIT K : Soleimani still owes $13,000 for over a year, also has issues with other intercom**

**000275**

[4/8/19, 9:00:45 PM] Samuel T: Hi Joe, I'd like to change out your KeyComs, and still service the other ones until the lite unit finally comes in, **but we really need to get some payments on your account. Can we get $10k of the ~$13k owed?**

[4/8/19, 9:02:50 PM] Joe Solemani: That's great. When will that happen? We need to discuss the invoices as all units have not been working. We had an understanding that we would not be charged from day 1 rather when they are working

[4/11/19, 6:10:42 PM] Samuel T: Joe, I really want to service your units, and switch them out to the new ones, but I really need to get some payments already. I never said that you don't need to pay for any of them, until ALL of them work perfectly. That makes no sense. **You have 10 buildings installed, and you have sporadic problems pretty much only on 3 of them. The rest all work. Can't you at least pay all the other ones in full? At least make some payments.**

[4/11/19, 6:38:41 PM] Joe Solemani: It's more than 3 devices. 1652 Park is the only one without issues. We have been extremely patient and have waited a very long timefor the "outdoor" units. We want a guaranteed time of replacement and a guarantee

of when everything will be running 100%. We can tie any payment plan into that.

[4/11/19, 7:43:45 PM] Joe Solemani: If you want to discuss over the phone I'll be

in the office tomorrow until about 1.

Thanks

**EXHIBIT L : Soleimani complains all of replacement (knock-off) company MVI's devices do not work**

**000159**

From: Joseph Soleimani <joe@abjny.com>

Date: Tue, Apr 16, 2019 at 3:29 PM

Subject: Update

To: Shragie Aranoff <shragie.a@mvisystems.com>


1. 100 W. 138th Street – system goes down monthly

2. 102 W. 138th Street – has been good since October.

3. 1652 Park Avenue – up and running smoothly

4. 2041 7th Avenue – not used as primary access as other systems are not working 100% yet

5. 2261 7th Avenue – intercom function has been an issue since the beginning and still an ongoing issue

6. 2269 7th Avenue – system goes down monthly

7. 2273 7th Avenue – constantly going down, waiting on replacement

8. 342/346 Lenox Avenue – system goes down often, waiting on replacement

9. 539 Lenox Avenue – has been replaced several times, goes down very often

10. 56. W. 127th Street - not used as primary access as other systems are not working 100% yet

11. 90 E. 18th Street - not used as primary access as other systems are not working 100% yet

**EXHIBIT M : Soleimani still didn't pay! Right before Passover ("Pesach")!**

**000152**

From: Samuel Taub <samuel.t@mvisystems.com>

Date: Wed, Apr 17, 2019, 2:56 PM

Subject: Re: Update

To: Joseph Soleimani <joe@abjny.com>

Cc: Gitty Rosenberg <gitty.r@mvisystems.com>, Simcha Milworm <simcha.m@mvisystems.com>,

Shragie Aranoff <shragie.a@mvisystems.com>


Hi Joe,

We have reviewed your list, and have provided our position on all the locations below.

Regardless, **as a company, we simply are unable to continue servicing your units, if we aren't paid for at least the services provided till now**. It's been a year already on some buildings, and we simply cannot continue to give free software service, as well as unlimited FREE hardware service.

In order for us to continue servicing you the way we have been doing over the past year, and to provide for you brand new KeyCom BOLT units for buildings, **we must receive a payment of at least $10k of the $13k owed**, before Pesach, via a wire transfer.

**We are sorry that you felt that you would be entitled to completely free software product**, as long as there is any issues at all, on any of the buildings with outdoor units, but that was never the case, and we are sorry if we gave you that impression. The software fees are our lifeblood, and we unfortunately cannot forgo that just because a KeyCom in one of the buildings has an issue for a short amount of time.

Of course we are open to working with you, on giving you some discounts for the few times the KeyComs had some glitches, **but to not pay anything, simply doesn't work for us.**


**000156**

[Page 92]

On Wed, Apr 17, 2019 at 3:30 PM Joseph Soleimani <joe@abjny.com> wrote:


Sam,


I just tried calling you again. I realize you are very busy and probably preparing for Pesach as well. I would like to discuss over the phone as it seems as though the messages are not being communicated properly. No one is asking for a free ride here. We are simply asking for a working product or a timeline of a working product. Obviously there were many issues and we jointly worked together to try and resolve them. We have had many instances where tenants were locked out of the building which is why we didn't switch on a few of the newer systems until ALL issues were resolved. That would be irresponsible and negligent on our end. Again, I think the message came across wrong, WE ARE NOT LOOKING FOR A FREE RIDE. We understand that we were guinea pigs from the beginning and were open to assisting you without asking for any compensation whatsoever. I have personally spoken to VC firms as requested and have only given positive feedback. Please understand the urgency in that several properties do not have a functioning system currently and tenants are being locked out of the building.


If you want to work something out, lets do that but please give me a call to discuss.


Thank You

**EXHIBIT N : Soleimani and MVI discuss Teman, US v Teman and the MVI systems not working in same document (MVI/ABJ group chat)**


000406

[7/16/19, 2:42:42 PM] Joe Solemani: Please advise on the status of the replacement systems. We are still having major issues

[7/16/19, 2:42:46 PM] Joe Solemani: We can not go on like this any longer

[7/17/19, 10:32:23 PM] Nati Ahranoff:

image omitted

[7/18/19, 12:00:36 PM] Samuel T: This needs to be taken care of by the dealer. The power supply most likely burnt out by the lightning surges.

[7/18/19, 12:01:09 PM] Samuel T: That's if they didn't put it behind a power surge Protector.

[7/18/19, 12:01:58 PM] Samuel T: We expect them to come in within the next few weeks.

[7/18/19, 12:02:38 PM] Joe Solemani: Can you please guarantee a date? We have systems that are not working and dont want to be forced to replace with other systems.

[7/18/19, 12:13:14 PM] Samuel T: Hard for me to guarantee anything, since it's not under my control. The factory in China had an issue with the order originally, something with the components being the wrong size, and that made a long delay. They are now telling me that they should start coming in within the next month. I can't guarantee anything unfortunately until I see it. We made a large order, so hopefully this will last for a while.

[7/18/19, 10:38:11 PM] Nati Ahranoff:

image omitted

[7/19/19, 10:59:34 AM] +1 (917) 407-5977: 90 east tenants are complaining they cannot buzz ppl in

[7/19/19, 10:59:39 AM] +1 (917) 407-5977: Not an internet issue

[7/19/19, 10:59:45 AM] +1 (917) 407-5977: Please advise.

[7/19/19, 11:01:48 AM] Samuel T: We have no connection to it. It does look like the internet is down. It's offline.

[7/19/19, 11:03:28 AM] Samuel T: This unit was offline until this morning, so thereis nothing we could have done. It's now back online.

[7/19/19, 12:07:42 PM] Simcha Milworm: I'm gonna spin by in a few (though keep in mind moving foward an issue like this is something the dealer has to go back for not MVI)

[7/24/19, 8:20:25 AM] Samuel T:
**https://therealdeal.com/2019/07/23/proptech-exec-ari-teman-arrested-on-bank-fraud-charges/**

[7/25/19, 5:31:53 PM]  -  +1 (917) 407 5977 left

[8/6/19, 9:15:12 AM] Joe Solemani: 1652 Park is not working


**000407**

[8/19/19, 9:40:38 AM] Joe Solemani: Can you please confirm when our systems will be working properly? We have been super patient for a very long time. Thank You

[…]

[8/19/19, 10:06:42 AM] Nati Ahranoff: 2041 has been dealing with this issue for far too long- please fix today. If not fixed ASAP we will have to swap it out with another intercom. I cant keep having tenants calling me on weekends because they are locked out.


**000408**

[8/27/19, 2:59:04 PM] Joe Solemani: Any update please?? We need firm dates on all systems. We will have no choice but to replace them ourselves.


**000276**

[9/12/19, 10:38:38 AM] Samuel T: **Are you available?**

[9/12/19, 3:54:13 PM] Joe Solemani: sorry i missed you - are you available soon?

[9/12/19, 4:16:39 PM] Samuel T: Yeah. Just give me a call.


**000415**

[11/5/19, 11:01:22 AM] Joe Solemani: We are still waiting for 2041 7th Avenue to work. **At this time we will request that the system be returned and our money refunded for this system.**

[11/5/19, 11:01:24 AM] Joe Solemani: Thank You


**000276**

[11/6/19, 12:33:57 PM] Samuel T: Any time to talk today?

[11/6/19, 4:11:46 PM] Joe Solemani: Hey- are you free within the next 20 minutes or

so

[11/11/19, 1:24:17 PM] Samuel T: Available now?

[11/11/19, 1:24:28 PM] Joe Solemani: sure, call my cell


**000277-278**

[12/11/19, 1:07:54 PM] Samuel T: **Teman Suicide Note.pdf** • 3 pages

<attached: 00000095-Teman Suicide Note.pdf>

[12/11/19, 1:09:17 PM] Joe Solemani: **What is that??**

[12/11/19, 1:11:06 PM] Samuel T: **Just got this from another management company being sued by Teman. Teman sent it to him. Read it. You and I are personally mentioned.**

[12/11/19, 1:11:36 PM] Samuel T: **I wonder what his game is now, or if he will actually do it.**

[12/11/19, 1:30:05 PM] Joe Solemani: **Thanks for sending**

[12/11/19, 2:05:10 PM] Samuel T:

https://lawandcrime.com/opinion/bizarre-no-stevie-nicks-contract-clause-takes-center-stage-in-nyc-legal-dispute/

[12/11/19, 2:23:32 PM] Samuel T:  <attached: 00000101-**Abi Goldenberg.vcf**>

[...]

[12/12/19, 10:34:52 AM] Samuel T: **Hi Joe. Please give me a call as soon as you can.**

**About Teman. Just need to be sure of something.**

[12/12/19, 10:35:05 AM] Samuel T: 30 seconds call

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

    *Plaintiff,*

       *v.*

ARI TEMAN,

    *Defendant.*

S2 19 Cr. 696 (PAE)

**CERTIFICATION
OF RONALD D. COLEMAN**

RONALD D. COLEMAN, of full age, affirms under penalty of perjury and says:

1.    I am a member of Dhillon Law Group, Inc. and was formerly counsel of record for Gateguard, Inc., of which Mr. Ari Teman, defendant in this criminal action, is principal, in a civil litigation matter in this Court styled *Gateguard, Inc. v. Goldmont Realty Corp., et al.,* 1:20-cv-01609(GWG)(AJN).

2.    On November 21, 2021, our firm filed a motion to be relieved in that matter, following Mr. Teman's instructions that we no longer represented it in this or any other matter. The end of this professional relationship was not cordial or pleasant.

3.    Notwithstanding these facts, Mr. Teman recently contacted me and asked me if I could recall certain events that took place approximately a year earlier, in October or November of 2020, and whether, if I did, I would prepare an affirmation setting out my recollection.

4.    Because I am familiar with Mr. Teman's jeopardy in this criminal matter, I agreed to do so. Obviously we have not and will not resume an attorney-client relationship.

5.    The particular matter Mr. Teman asked me about involves what has been described to me, and what I have read about in press reports, as a relationship—particularly, a spousal relationship—between a prosecutor in the office of United States Attorney for the Southern

District of New York involved in the prosecution of this action against Mr. Teman and his defense counsel at the law firm of Sher Tremonte.

6.    Mr. Teman asked me if I remembered participating in a telephone call with him and Sher Tremonte lawyers that took place in November of 2020, which was prior to the disclosure of this relationship and Mr. Teman's subsequent discharge of that law firm.

7.    I do remember such a call, and I remember that there was discussion of whether the Sher Tremonte lawyers had contacted, or were going to contact, shareholders at 18 Mercer Street, a cooperative or condominium where a GateGuard device had been installed, to obtain documents regarding a member of the building's board being terminated for improper conduct in connection with its relationship with GateGuard. My understanding is that this same person testified on behalf of the Government in Mr. Teman's trial.

8.    My recollection is that the Sher Tremonte lawyers said that they did, or intended to, request such documents.

The foregoing is certified to be true to my best knowledge.   I understand that if it is not true, I am subject to penalties for perjury.

RONALD D. COLEMAN

November 22, 2021

2

# E. Procedural Record

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

**CASE NO. 25-CV-22543-RAR**

ARI TEMAN,

      Petitioner,

v.

UNITED STATES OF AMERICA, *et al.*,

      Respondents.

_____/

## ORDER OF TRANSFER

**THIS CAUSE** comes before the Court on Petitioner's Response to Show Cause Order ("Response"). [ECF No. 8]. On June 4, 2025, Petitioner Ari Teman filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2241 ("Petition"). *See* Petition, [ECF No. 1]. The Petition asks the Court to "[g]rant a writ of habeas corpus under 28 U.S.C. § 2241, immediately releasing [Petitioner] from probation in Case No. 19-CR-696 (PAE)" before Judge Paul A. Engelmayer in the United States District Court for the Southern District of New York. *Id.* at 13. Because the Petition appeared to attack the validity of Petitioner's sentence under 28 U.S.C. § 2255—and not the conditions of his confinement under 28 U.S.C. § 2241—the Court entered an Order to Show Cause on June 5, 2025, requiring Petitioner to show cause (1) why Petitioner's request for release from probation is proper under 28 U.S.C. § 2241, and (2) explaining why the Court should not either dismiss the Petition or transfer it to the Southern District of New York pursuant to 28 U.S.C. § 2255. On June 16, 2025, Petitioner filed the Response. [ECF No. 8]. Because the Response fails to demonstrate why the Petition is proper under 28 U.S.C. § 2241, the Court finds that it must treat the Petition as a motion under 28 U.S.C. § 2255, and transfers the case to the United States District Court for the Southern District of New York, as set forth herein.

## **BACKGROUND**

Petitioner was convicted of four counts of bank and wire fraud and sentenced to one year and one day of imprisonment and three years of supervised release. *See* Judgment, *USA v. Teman*, Case No. 1:19-cr-00696-PAE-1 (S.D.N.Y. July 29, 2025) ("*Teman*"), ECF No. 253 at 1–4. Petitioner is "currently under probation supervised by the U.S. Probation Office in [the Southern District of Florida]." Petition at 2.  On September 16, 2024, Judge Engelmayer granted Petitioner permission to travel to Israel from September 18, 2024, to November 6, 2024. Order, *Teman* (S.D.N.Y. Sept. 13, 2024), ECF No. 455.  Upon return to the United States, Petitioner was required to report to Miami and surrender his passport to the probation office no later than November 19, 2024. *Id.*  While in Israel, Petitioner made several requests to stay in Israel indefinitely; Judge Engelmayer denied the requests to remain in Israel indefinitely, but nevertheless granted several extensions of Petitioner's authorized stay in Israel, ultimately requiring Petitioner's return to the United States by June 1, 2025. *See id.* (S.D.N.Y. Nov. 7, 2024), ECF No. 465; *id.* (S.D.N.Y. Jan. 10, 2025), ECF No. 475; *id.*, (S.D.N.Y. Jan. 24, 2025), ECF No. 484; *id.* (S.D.N.Y. Apr. 17, 2024), ECF No. 531.

To date, Petitioner has not returned to the United States. *See* Petition at 13 (indicating that Petitioner seeks to "remain in Israel").  Petitioner now requests that the Court "release" Petitioner from probation and stay Judge Engelmayer's Order requiring Petitioner to return to the United States pending resolution of the Petition. *See* Petition at 9 ("Immediate release from probation is necessary to prevent irreparable harm[.]"); *id.* at 10 ("Release from probation is warranted[.]"); *id.* at 13 ("Teman seeks immediate release from probation"); *id.* (requesting that the Court "[g]rant a writ of habeas corpus under 28 U.S.C. § 2241, immediately releasing TEMAN from probation in

[Page 102]

Case No. 19-CR-696 (PAE)."); *id.* (requesting that the Court "stay [Judge] Engelmayer's June 1, 2025, return order (Dkt. 531) pending resolution of this petition.").

## ANALYSIS

Although Petitioner claims he seeks relief under § 2241, the relief requested—to "release" Petitioner from his sentence of probation—can only be sought under § 2255. And because a § 2255 motion must be brought in the "court which imposed the sentence" being challenged, this Court does not have jurisdiction over Petitioner's request. 28 U.S.C. § 2255(a).

Section 2255 permits a prisoner to file a motion to vacate, set aside, or correct his sentence "upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." *Id.* "A federal prisoner typically must collaterally attack his conviction and sentence through a 28 U.S.C. § 2255 motion." *Boyd v. United States*, 754 F.3d 1298, 1301 (11th Cir. 2014) (citing 28 U.S.C. § 2255(a)); *see also Broussard v. Lippman*, 643 F.2d 1131, 1134 (5th Cir. 1981) ("Attacks on the underlying validity of a conviction must be brought under 28 U.S.C. [§] 2255, not 28 U.S.C. [§] 2241(c)."). Petitioner seeks "release" from probation, a quintessential § 2255 attack on Petitioner's sentence. *See United States v. Walton*, 819 F. App'x 731, 733 (11th Cir. 2020) (describing the defendant's request for termination of his federal supervised release as "an improper collateral attack on his sentence," which, as a general matter, "is presumed valid until vacated in a 28 U.S.C. § 2255 proceeding"). Therefore, the Petition seeks relief that generally can be sought only through a § 2255 proceeding.

The only way Petitioner could use a § 2241 petition to challenge his conviction and sentence is if § 2255 proves to be "inadequate or ineffective to test the legality of detention" under

§ 2255's "saving clause," 28 U.S.C. § 2255(e). *See Jeffus v. United States*, No. 21-10202, 2024 WL 3549212, at *2 (11th Cir. July 26, 2024). "The saving clause permits a federal prisoner to proceed under § 2241 when, for example, he is: (1) 'challeng[ing] the execution of his sentence, such as the deprivation of good-time credits or parole determinations'; (2) the sentencing court was unavailable; or (3) 'practical considerations (such as multiple sentencing courts) might prevent a petitioner from filing a motion to vacate.'" *Id.* (quoting *McCarthan v. Dir. of Goodwill Indus.-Suncoast, Inc.*, 851 F.3d 1076, 1092–93 (11th Cir. 2017)). The petitioner "bears the burden of demonstrating eligibility under the saving clause of § 2255." *Id.* citing (*McGhee v. Hanberry*, 604 F.2d 9, 10 (5th Cir. 1979)).

Petitioner fails to demonstrate that § 2255 is "inadequate or ineffective to test the legality of detention" under the saving clause. Petitioner contends that he should be allowed to proceed under § 2241 because he already has a § 2255 motion pending in the United States District Court for the Southern District of New York.[1] *See* Resp. ¶ 1. If Petitioner means to argue that § 2255 is "inadequate or ineffective" because he has already filed a § 2255 petition and therefore would be barred from requesting further relief under § 2255 under the rule against "second or successive" § 2255 petitions, that argument is foreclosed. *See* 28 U.S.C. § 2255(h). The Supreme Court has made clear that "the purpose of § 2255(e) is narrow and does not provide an end-run around § 2255(h)'s bar on second or successive § 2255 motions." *Jeffus v. United States*, 2024 WL 3549212, at *2 (citing *Jones v. Hendrix*, 599 U.S. 465, 479–80 (2023)).

Petitioner's only other argument for why the saving clause does not apply is that "the allegations alleged in [Petitioner's] 28 U.S.C. §2241 petition are against Judge Engelmayer and

---

[1] Petitioner filed a motion to vacate his sentence pursuant to 28 U.S.C. § 2255 in the Southern District of New York on October 31, 2024. *See Teman v. United States of America*, Case No. 1:24-cv-08278-PAE (S.D.N.Y. Oct. 31, 2024), ECF No. 1.

not [Petitioner's] attorneys or due to the sentence being in violation of the United States Constitution, [therefore,] a 28 U.S.C. §2255 petition is clearly 'inadequate or ineffective to test the legality of detention[.]'" Resp. ¶ 5. A § 2255 petition is not limited to collateral attacks based on the constitutionality of the sentence or those based on ineffective assistance of counsel. Again, § 2255 permits a prisoner to file a motion to vacate, set aside, or correct his sentence "upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, *or is otherwise subject to collateral attack.*" 28 U.S.C. § 2255(a) (emphasis added). Whatever Petitioner's reasons are for requesting "release" from probation—and they are numerous[2]—it remains the case that the relief sought is still a collateral attack on the sentence and must be pursued through a § 2255 motion unless the saving clause applies. *See Walton*, 819 F. App'x at 733. Because Petitioner does not provide any other explanation for why § 2255 is inadequate or ineffective to seek release from probation, the saving clause does not apply.

---

[2] Plaintiff articulates a litany of reasons why the Court should terminate Petitioner's supervised release. *See, e.g.*, Petition at 5 ("The court should free this innocent young Jewish man with no criminal history and a lifetime of volunteering."); *id.* ("This court should grant the wishes of these many Rabbis and legal experts and [Petitioner's] elderly and unwell parents and free this innocent young man today by ending probation and moving this case to [the Southern District of Florida] where it can be given a fair adjudication free from [Judge] Engelmayer's admitted regular ex parte calls[.]"); *id.* at 6 (alleging that Petitioner's need for "urological and potential ENT surgeries . . . constitutes deliberate indifference, necessitating immediate release to allow [Petitioner] to access surgeries in Israel"); *id.* at 9 ("Immediate release from probation is necessary to prevent irreparable harm, as [Petitioner] cannot safely or feasibly return to Miami Beach."); *id.* at 10 ("Release from probation is warranted to mitigate the ongoing harm of [Judge] Engelmayer's biased supervision pending resolution of these motions."); *id.* at 11 (arguing that "[r]elease from probation is the least restrictive means to restore [Petitioner's] religious freedoms" because Petitioner's sentence prevents him "from fulfilling his religious obligation to live in Israel"); *id.* at 12 (arguing that Petitioner's "over one year of post release supervision without violation" supports release from probation); *id.* at 13 ("[Petitioner] seeks immediate release from probation to access potentially life-saving medical care, avoid permanent injury and end agonizing pain, and exercise his religious freedoms.").

Accordingly, the Petition can only be treated as a motion to vacate under § 2255. *See United States v. Stossel*, 348 F.3d 1320, 1322 n.2 (11th Cir. 2003) ("Federal courts are obligated to look beyond the label of a pro se inmate's [filing] to determine if it is cognizable under a different statutory framework."). And because the Petition is really a motion to vacate under § 2255, the Court does not have jurisdiction because a § 2255 motion must be filed in the "court which imposed the sentence" being challenged—in this case, the the Southern District of New York. *See* 28 U.S.C. § 2255(a); *see also Padgett v. Warden, USP Atlanta*, 745 F. App'x 859, 862 (11th Cir. 2018) ("[A] district court does not possess jurisdiction to consider a § 2241 habeas petition filed by a federal prisoner unless 'the remedy by [§ 2255] motion is inadequate or ineffective to test the legality of his detention.'" (quoting 28 U.S.C. § 2255(e))).

Consequently, the Court must either dismiss the case or transfer it to the Southern District of New York. *See Thompson v. Warden*, 2021 WL 4165335, at *2 (11th Cir. Sept. 14, 2021) (affirming dismissal where "[t]he district court considered [a] 28 U.S.C. § 2241 petition as a 28 U.S.C. § 2255 motion to vacate and dismissed [the] case, because it was the court of detention, rather than the sentencing court, which would be the proper venue for a motion to vacate[.]"); 28 U.S.C. § 1631 (providing that a court "shall if it is in the interest of justice, transfer" any action over which it does not have jurisdiction "to that court in which the action or appeal could have been brought at the time it was filed or noticed"). The Court finds that the "interest of justice" here favors a transfer to the United States District Court for the Southern District of New York.[3]

---

[3] When a *pro se* movant has not previously filed a § 2255 motion challenging his conviction, he must receive notice if his pleading will be treated as one. *See Castro v. United States*, 540 U.S. 375, 383 (2003) ("[W]hen a court recharacterizes a pro se litigant's motion as a first § 2255 motion[,]" the court "must notify the pro se litigant that it intends to recharacterize the pleading, warn the litigant that this recharacterization means that any subsequent § 2255 motion will be subject to the restrictions on 'second or successive' motions, and provide the litigant an opportunity to withdraw the motion or to amend it"). Although *Castro* arguably does not apply here because Petitioner is represented by counsel and has previously filed a § 2255 motion, the Court's Order to Show Cause nevertheless warned Petitioner that "failure to show good cause

## **CONCLUSION**

Accordingly, the Court having reviewed the Petition, the record, and being otherwise fully advised, it is hereby

**ORDERED AND ADJUDGED** that this action is hereby **TRANSFERRED** to the United States District Court for the Southern District of New York. All pending deadlines are hereby **TERMINATED.** Upon transfer, the Clerk is directed to **CLOSE** this case.

**DONE AND ORDERED** in Miami, Florida, on this 18th day of June, 2025.

_____
**RODOLFO A. RUIZ II**
**UNITED STATES DISTRICT JUDGE**

---

in compliance with [the Order to Show Cause] may result in the Court recharacterizing the instant Petition as a § 2255 motion, which would make any of Petitioner's future collateral attacks on his conviction and sentence subject to the rule against second or successive § 2255 motions" and advised Petitioner that "he may withdraw the Petition or amend it so that it contains all the § 2255 claims he believes he has." [ECF No. 6] at 4 n.2.

Docket Number 12, Jul 31, 2025 - PAPERLESS ORDER denying 11 Motion for Reconsideration under Rule 60(b) ("Motion").

On June 18, 2025, the Court entered an Order of Transfer ("Order"), [ECF No. 9]. The Order found that the Court does not have jurisdiction over this action because Petitioner Ari Teman's Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2241 ("Petition"), [ECF No. 1], was really a motion under 28 U.S.C. § 2255 to vacate his sentence of supervised release, and a § 2255 motion must be filed in the "court which imposed the sentence" being challenged, in this case, the Southern District of New York. See Order at 6 (quoting 28 U.S.C. § 2255(a)). The Court therefore transferred this action to the Southern District of New York pursuant to 28 U.S.C. § 1631. See id. at 6-7. Teman now seeks reconsideration of the Order under Rule 60(b), which "allows a party to seek relief from a final judgment under a limited set of circumstances," Gonzalez v. Crosby, 545 U.S. 524, 528 (2005), including mistake, newly discovered evidence, fraud, a void or satisfied judgment, or any other reason that justifies relief. See Fed. R. Civ. P. 60(b)(1)-(6). Teman maintains that the Petition "challenges the execution of supervised release under § 2241." Mot. at 3. However, a Rule 60(b) motion is an "extraordinary remedy, to be employed sparingly." Martes v. Sacco, No. 10-80962-CIV, 2011 WL 13272347, at *1 (S.D. Fla. Apr. 7, 2011). Rule 60(b) is "not a vehicle for rehashing arguments the Court has already rejected or for attempting to refute the basis of the Court's earlier decision." Id. The Court already addressed whether this action is a § 2241 petition challenging the execution of his sentence or a § 2255 motion to vacate his sentence, and concluded that Teman's request to "release" him from probation was "a quintessential § 2255 attack on Petitioner's sentence" that should have been brought in the Southern District of New York. Order at 3; see also id. at 6. Teman's contention that the Court got it wrong, standing alone, is insufficient to demonstrate entitlement to the "extraordinary remedy" of reconsideration. See Z.K. Marine Inc. v. M/V Archigetis, 808 F. Supp. 1561, 1563 (S.D. Fla. 1992) (citation modified) ("It is an improper use of the motion to reconsider to ask the Court to rethink what the Court already thought through--rightly or wrongly."). Accordingly, the Motion, [ECF No. 11], is DENIED. Signed by Judge Rodolfo A. Ruiz, II on 7/31/2025. (jgz) (Entered: 08/01/2025)

<div align="center">

**UNITED STATES COURT OF APPEALS**

**FOR THE SECOND CIRCUIT**

</div>

<div align="right">

**Case No.: NO. 25-12659-C**

</div>

**Ari Teman,**
  Appellant,

-v.-

**United States of America,**
  Appellee.

**Certificate of Service**

I hereby certify that on 2025-08-29, I caused the foregoing **APPENDIX** to be served by U.S. Mail and via filing via the Clerk's office to ECF and via email on the following:

**U.S. Attorney's Office – Southern District of Florida**
Attn: Hayden P. O'Byrne, Assistant U.S. Attorney
99 N.E. 4th Street
Miami, FL 33132

Dated: 2025-09-10
Miami Beach, Florida

**s/Ari Teman/**
Appellant, Pro Se
1521 Alton Road #888
Miami Beach, FL 33139

ARI TEMAN & LYLI
0017817183375
12674 NW 10TH TER
MIAMI FL 33182-2040

**0.1 LBS LTR**     **1 OF 1**

**SHIP TO:**
CLERK, US COURT OF APPEALS
7865554312
US COURT OF APPEALS
56 FORSYTH ST NW
**ATLANTA GA 30303-2218**



## GA 303 9-02



# UPS 2ND DAY AIR

TRACKING #: 1Z J86 F66 02 0800 5055     **2**



BILLING: 3RD PARTY



XOL 25.08.06     NV45 39.0A 09/2025*

# UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

**Case No. 25-12659-CC**

**Ari Teman,**
    Petitioner–Appellant,

v.

**United States of America, et al.,**
    Respondents–Appellees.

## CERTIFICATE OF SERVICE

I hereby certify that on September 26, 2025, I caused a true and correct copy of the foregoing **Motion to Reinstate Appeal** (together with attached Exhibits) to be served via electronic mail ("email") upon the following counsel for the United States:

**Daniel Matzkin**
Chief, Appellate Division
United States Attorney's Office
Southern District of Florida
Email: **Daniel.Matzkin@usdoj.gov**

Service was made by email pursuant to Fed. R. App. P. 25(c)(2) and local rules of this Court.

---

Dated: September 26, 2025
Tel Aviv, Israel

                                        **s/ Ari Teman**

Appellant, Pro Se
1521 Alton Road #888
Miami Beach, FL 33139

ARI TEMAN & LYLI
0017817183375
12674 NW 10TH TER
MIAMI FL 33182-2040

**0.1 LBS LTR**   **1 OF 1**

SHIP TO:
CLERK, US COURT OF APPEALS
7865554312
US COURT OF APPEALS
56 FORSYTH ST NW
**ATLANTA  GA  30303-2218**

U.S. COURT OF APPEALS
RECEIVED
CLERK
OCT 3 0 2025
OCT 0 1 2025
ATLANTA, GA
ATLANTA, GA

# GA 303 9-02

## UPS 2ND DAY AIR
TRACKING #: 1Z J86 F66 02 0800 5055

**2**

BILLING: 3RD PARTY

XOL 25.08.06     NV45 39.0A 09/2025*     ™